843 A.2d 1042

KATHLEEN VERDICCHIO AND VINCENT VERDICCHIO, INDI-
VIDUALLY AND AS EXECUTORS OF THE ESTATE OF STE-
PHEN VERDICCHIO, PLAINTIFFS–APPELLANTS AND
CROSS–RESPONDENTS, v. ANTHONY RICCA, M.D. AND HA-
ZLET HEALTH CARE, DEFENDANTS–RESPONDENTS AND
CROSS–APPELLANTS.

Argued October 7, 2003—Decided March 15, 2004.

*Philip G. Auerbach* argued the cause for appellants and cross respondents (*Auerbach & Ryan,* attorneys).

*Richard A. Grossman* argued the cause for respondents and cross appellants (*Grossman, Kruttschnitt, Heavey & Jacob,* attorneys; *Mr. Grossman* and *Thomas J. Heavey,* on the briefs).

Justice LONG delivered the opinion of the Court.

On appeal in this medical malpractice case, we revisit the thorny problem of assessing proximate cause in the context of harm generated by concurrent forces. More particularly, we are called on to apply the increased risk doctrine in a case alleging failure to diagnose cancer. On the facts before us, it is not known whether the cancer had metastasized at the time of the deviation. As a result, the trial court set aside a substantial verdict in plaintiffs' favor and the Appellate Division affirmed, essentially holding that

the absence of proof regarding metastasis was a fatal flaw in plaintiffs' increased risk analysis. We now reverse, on the ground that those courts too narrowly characterized the notion of increased risk and required quantification that is not necessary under our jurisprudence.

I

The matter arose when plaintiffs Kathleen and Vincent Verdicchio, individually and as executors of the estate of their son, Stephen Verdicchio, filed a wrongful death and survivorship action against defendant, Dr. Anthony Ricca, alleging malpractice in connection with Dr. Ricca's failure to timely diagnose Stephen's cancer. Dr. Ricca answered, denying the allegations of the complaint. The matter was tried over eight days. At the end of the Verdicchios' case and again at the conclusion of the trial, Dr. Ricca moved to dismiss the complaint. The trial court reserved decision on both motions.

The jury returned a verdict declaring that Dr. Ricca had been negligent in his treatment of Stephen; that the negligence "increased the risk" of a bad outcome; and that that increased risk was a "substantial factor" in bringing about the ultimate harm that befell Stephen. It awarded the estate $6,500,000 in the survival action and $1,500,000 in the wrongful death action. Because the jury concluded that the underlying disease, osteosarcoma, was responsible for 45% of the outcome and Dr. Ricca for 55%, the total judgment of $8,000,000 was molded to $4,400,000. Dr. Ricca then moved for a judgment nothwithstanding the verdict.

The trial court granted that motion along with the previous dismissal motions on the ground that:

In my opinion the plaintiffs must prove that a chance of avoiding the harm existed. Plaintiff must have shown this by proving that Stephen's cancer had not metastasized in January of 1994. However, plaintiffs took the stance that Stephens's cancer had not metastasized to his lungs by January of 1994.

But plaintiffs .. did not prove that fact. In fact, plaintiffs' expert was unable to render any opinion regarding the metastasis of Stephen's cancer. Thus, plaintiffs

did not meet the burden of proving an element of the modified proximate causation test.

The Appellate Division affirmed the trial court's decision concluding that "plaintiffs failed to establish by expert testimony that Stephen was suffering from non-metastasized cancer at the time of the alleged deviation by defendant, and thus, failed to meet their burden of proof in an 'increased risk' case under the modified proximate causation test enunciated in *Evers v. Dollinger*, 95 *N.J.* 399, 471 *A.*2d 405 (1984), *Scafidi v. Seiler*, [119] *N.J.* 93, 574 *A.*2d 398 (1990), and *Gardner v. Pawliw*, 150 *N.J.* 359, 696 *A.*2d 599 (1997)." The panel held that the jury was left with no proof, other than speculation, that Stephen's condition was such that, had the defendant diagnosed it as of January 1994, Stephen's chance of survival would have been increased.

The Verdicchios filed a petition for certification and Dr. Ricca, a cross-petition. We granted both, *Verdicchio v. Ricca*, 175 *N.J.* 79, 812 *A.*2d 1111 (2002), and now reverse.

II

The relevant facts established at trial are as follows: Dr. Ricca, a board certified internist, became Stephen Verdicchio's primary care physician on May 22, 1993, when Stephen was seventeen years old. Dr. Ricca was selected by the Verdicchio family from a list of eligible physicians associated with the family's insurance carrier, Oxford Health. On that visit, Dr. Ricca recorded that Stephen was generally healthy but experienced some lethargy and difficulty running track at school. He also reported bowel movements after each meal.

Stephen saw Dr. Ricca again on August 3, 1993, to obtain medical clearance to compete on his high school track team. According to Mrs. Verdicchio, during that visit, she told the doctor that Stephen continued to have bowel problems and some difficulty breathing. Dr. Ricca ordered blood tests, a chest x-ray, and an electrocardiogram that all proved to be normal.[1] According to Dr.

---

[1] Dr. Ricca testified that he would not normally order an x-ray, but did so at Mrs. Verdicchio's request because Stephen had a history of pneumonia.

Ricca, neither Mrs. Verdicchio nor Stephen mentioned any stomach pains, bowel problems or diarrhea. Dr. Ricca also examined Stephen's legs and knees and did not record any evidence of pain or deficits in range of joint motion.

Dr. Ricca again saw Stephen on October 2, 1993, when he administered a flu shot. Mrs. Verdicchio testified she made that appointment because Stephen was not feeling well, was still tired and lifeless, and continued to have bowel problems. He also continued to lose weight. Dr. Ricca denied that those symptoms were even mentioned during the visit. His records merely indicate that Stephen went in for a flu shot. In that connection, Mrs. Verdicchio testified as follows:

A. I went there because he wasn't feeling good. He wasn't getting better. He was tired. He was lifeless. He was losing weight. I kept watching this young man who would eat and I should be buying him larger size shirts or bigger pants or what have you and it wasn't coming to that.... So I took him to the doctor.

Q. Now, did you take him merely to get a flu shot?

A. The flu shot never entered my mind. Why would you give a high school student a flu shot?

Q. Okay. Now, in Dr. Ricca's records he says, "Allergies, many environmental allergies," he says. Did you tell him that he had allergies or did you tell him about these complaints?

A. I told him about the complaints and probably what used the word, his allergies coming off of going into a season again up there. But I know that every time we walked in I felt like a broken record. Every time I walked in, I was saying the same things.

Mrs. Verdicchio testified that in response to her expressed concerns during that visit about Stephen's bowel problems, Dr. Ricca told her she was a paranoid mother not ready to let go of her son, and that that was adding stress for Stephen. She also testified that the doctor told her the bowel movements could be a sign of anorexia, which is found many times in runners, and that Stephen could also be using laxatives or other drugs. Dr. Ricca denied making any of those statements.

Mrs. Verdicchio recounted that in the late fall of 1993 to early January 1994, Stephen continued to complain of pain in his left leg and continued to lose weight. On January 25, 1994, Stephen and Mrs. Verdicchio went to see Dr. Ricca. Mrs. Verdicchio recounted

that Stephen complained of problems with bowel movements, diarrhea, weight loss and specifically with pain in his left leg. Dr. Ricca denied that Stephen or his mother raised the issue of leg pain. He recorded in his computerized "Patient Chart Notes" that Stephen "appears seriously ill." The chart also indicated under "Current Complaint"—"diarrhea, constipation, and stomach pains." The patient history further described:

> Otherwise healthy 17 year old male presents with several month history of diarrhea. The patient states that he has had periods of normal bowel movements followed by days of watery diarrhea. The patient states that he has never seen blood in the stool. The stool has never been black. He states that after a few mouthfuls of food he has to evacuate his bowels. He has occasional crampy abnormal pain. No fever, sweats, chills. *Some arthralgias of the knees but the patient is a track runner.* He is not yet sexually active. No vomiting. The patient states that he has periods of constipation. Actually, the patient has lost 17 pounds over the last 5 months.
>
> [Emphasis added.]

Mrs. Verdicchio testified that Dr. Ricca never suggested even indirectly that Stephen was seriously ill:

> A. No, no. He never told me that. If he would have told me that,—don't you think I would have went to another doctor? No mother, no parent has a doctor say to you, your child is seriously ill, when you know in your heart there is already something wrong and ignore it. No mother would do that. I'm sorry.

Mrs. Verdicchio stated in regard to the leg pain that Dr. Ricca told them that track runners generally have aches and pains in the legs, and that if Stephen was going to be a track runner he would have to accept the pain. Dr. Ricca testified that he asked Stephen if he was having any joint pain, and Stephen indicated achiness in *both* knees. The doctor acknowledged that he did not examine Stephen's legs or knees, attributing the complaint of pain to Stephen's running:

> Q. You have been criticized for not examining Stephen's legs that day when you elicited this response to your question about joint pain.
>
> A. Yes.
>
> Q. Why didn't you examine his knees or legs that day?
>
> A. This was a directed examination. We were looking for the cause of his diarrhea. The arthralgias related to the knees were an incidental to what was going on. The question of the arthralgias was dedicated to finding out what the cause of the diarrhea was. I would also say that in examining the patient, you

would take an overview of the patient. And even though it's not marked down that the knees were specifically examined, I couldn't attest that they weren't examined.

Dr. Ricca ordered laboratory tests that revealed an elevated white blood count, as well as elevated neutriphils, and uric acid levels. Dr. Ricca also recommended that Stephen see a gastroenterologist and authorized a referral to Dr. Kern who examined Stephen on February 4, 9 and 22, 1994.

Dr. Kern reported to Dr. Ricca on March 7, 1994, that he had not found evidence of suspected inflammatory bowel disease, and that Stephen had "improved significantly on just Imodium [an over-the-counter drug that stops diarrhea by preventing the bowel muscles from contracting] having gained ten pounds in two weeks." Dr. Kern indicated that he discussed with Mrs. Verdicchio that Stephen's symptoms could be related to irritable bowel syndrome secondary to emotional distress relating to his relationship with her. He also recommended that if Stephen's symptoms should recur or not continue to improve, Stephen should receive a D–Xylose test to determine if he had malabsorption syndrome.

On February 12, 1994, Stephen called Dr. Ricca regarding the results of tests administered by Dr. Kern. Dr. Ricca testified that although he was not sure whether his office had received those results yet, he called Stephen back that same day but that no one answered. Thereafter, according to Dr. Ricca, there was no further contact between him and Stephen until May 3, 1994.

Mrs. Verdicchio testified regarding Stephen's condition after the visit with the gastroenterologist:

A. It seemed like for a few weeks he was getting better ... and then all of a sudden, almost like the turning of a television channel, he was starting to lose weight again, he was getting up and going to the bathroom, complaining. He had always complained of the leg, but he was back complaining of it severely. The knee.

Q. What did you do as a result?

A. I called Dr. Ricca's office.

Q. And did you speak to him personally?

A. Yes.

Q. And tell us—

Court: Can we fix a time frame?

Q. Can we fix a time frame? When was this? Do you have any idea of when it was?

A. I have an idea, because Stephen was still, it was spring track. It was probably the end of April, in the beginning of May, because we were still, he was finishing another track season and I was really concerned.

Q. And what did—tell us about the conversation.

A. The conversation, I can't give it word to word, but the concept was that the track season was ending and to give Stephen a break, but that pressure was going to come on more because he was going to be applying to colleges and all. But to see, again, the same thing he had said the season before, see how it is after he rests it awhile and see how he feels after being out of school and not having the pressures of the school.

Dr. Ricca examined Stephen again on May 3, 1994, after Stephen collapsed during a track meet and was experiencing pain in his left leg. Dr. Ricca's "Patient Chart Notes" indicated that Stephen complained of pain before and after, but not during running, from his left hip down to the anterior shin. Dr. Ricca recorded that no known trauma existed but that there was "tenderness over left thigh at the lateral aspect with muscle edema." He recommended rest for several days and then ice followed by heat after running, along with Tylenol for the pain and an Ace bandage for support. Dr. Ricca did not weigh Stephen on that visit and did not ask about his bowel problems. He also did not order an x-ray. With respect to the x-ray, Stephen called Mrs. Verdicchio from Dr. Ricca's office. She testified:

A. On May 3rd, 1994, Stephen ran a track meet ... He fell on the field ... I never got up there, because Stephen called me from Dr. Ricca's office and said, I remember the first thing he said to me is, I can run. And I thought, oh God. And he said, it's okay. I'm okay. And I said, are you going for an x-ray and he said, no and I asked him to put Dr. Ricca on. And Dr. Ricca said, I keep telling you, it's a sprain, he'll be okay. And I said, and he's got a big meet in two days. If he rests it and he puts ice on it, there is no reason he can't participate.

On May 5, 1994, Stephen returned to Dr. Ricca's office and was seen by an associate, Dr. Stillwell.[2] Stephen reported that he had applied ice and heat as directed but had continued to run, and had

---

[2] Dr. Stillwell was initially a defendant. At the end of the Verdicchios' case, he was dismissed by consent.

again collapsed during a track meet. Dr. Stillwell recommended that Stephen continue the same treatment ordered by Dr. Ricca. Mrs. Verdicchio testified that she called Dr. Ricca's office on May 9, 1994, because Stephen continued to experience pain, but that the doctor did not return her call. Dr. Ricca testified that a member of his office staff told Mrs. Verdicchio to call back when Stephen got home from school, but that Mrs. Verdicchio never did so.

In June 1994, the Verdicchio family went on a cruise to Bermuda. During that time, Stephen appeared to be in great discomfort, crying in the night from the pain in his leg. On July 2, 1994, immediately after returning from vacation, Mrs. Verdicchio took Stephen to Dr. Ricca's office. The examination revealed swelling and firmness in the leg that felt "abnormal." Dr. Ricca told Stephen and Mrs. Verdicchio that he would order x-rays of Stephen's leg, and that he would wait for those results to decide how to proceed. He weighed Stephen at Mrs. Verdicchio's request, and found that the boy had lost five to seven pounds on the trip.

Mrs. Verdicchio testified that she insisted that Dr. Ricca give her the referral for the orthopedist so that she could at least make an appointment while they waited for the x-ray results. She told her husband that she "had to literally fight," . . . "scream" . . ., for a referral to an orthopedist. Mrs. Verdicchio ultimately obtained a referral from Dr. Ricca to see Dr. Bernard P. Murphy.

On July 7, Stephen was examined by Dr. Murphy, who reviewed the x-rays and found they revealed calcification in the quadriceps musculature as well as some calcification of the femur. Dr. Murphy ordered an MRI that was conducted on July 13, 1994, and revealed a mass in Stephen's leg. The doctor immediately advised the Verdicchios to take Stephen to the Thomas Jefferson Medical Center in Philadelphia for a biopsy. Stephen was first seen at Thomas Jefferson the next day and was diagnosed with osteosarcoma (a malignant tumor) of his left femur. It was also determined that the cancer had metastasized to Stephen's lungs.

Mrs. Verdicchio testified, over Dr. Ricca's objection, that on July 18, 1994, she called him and informed him that Stephen had been diagnosed with cancer and that the doctors at Thomas Jefferson needed Stephen's records, especially the most recent x-rays:

When I was talking to Dr. Ricca on the phone, his comment was that he had the x-ray and he had a copy of the tests and Stephen did not have cancer and I was to get him out of the hospital in Philadelphia and bring him home and he would deal with it at home.

Dr. Ricca acknowledged speaking with Mrs. Verdicchio that day but unequivocally denied that he made any of those statements. Maureen (Ginger) Mulligan, a co-worker of Mrs. Verdicchio, was permitted to testify that Mrs. Verdicchio called her, "hysterical," "sobbing" and "crying," and related the conversation in which she claimed Dr. Ricca denied that Stephen had cancer.

Stephen was hospitalized from July 14 to August 3, 1994. On July 17, a CAT scan was taken of Stephen's chest that revealed multiple metastatic nodules. Another CAT scan of his abdomen and pelvis taken on July 30 revealed further metastasis to his lungs and abdomen beyond that revealed on July 17. Stephen underwent surgical procedures to insert an intrafemoral artery catheter from his right leg to his left groin and into the cancer spot for the administration of chemotherapy, and was immobilized for about 14 to 20 days while he received treatment.

In November 1994, Stephen was hospitalized for six days and underwent a thoracotomy in an effort to arrest the spread of the cancer. In that surgical procedure, surgeons opened his chest and removed thirteen "wedge resections" containing metastatic tumors from many parts of the lung. In January 1995, Stephen was hospitalized for ten days and his left leg was amputated at the hip because he was suffering intractable pain secondary to the cancerous tumor that was unresponsive to medication.

In March of 1995, Stephen was admitted to Thomas Jefferson for the final time, with complaints of increased pain and voice change. Nothing more could be done for him medically, so he was discharged to his home on March 21, 1995. He died at home on

May 3, 1995, believing that had his cancer been diagnosed earlier by Dr. Ricca, he might have been saved.

During trial plaintiffs offered Dr. Robert Morrow, a certified family physician, as an expert. Family medicine is a primary care specialty in which the physician serves as the first doctor of recourse when patients come with nonspecific or specific complaints for treatment or referral. Dr. Morrow reviewed the medical records maintained by Dr. Ricca from Stephen's visits during the period of time he was under Dr. Ricca's care, and noted that during the January 25, 1994, visit, Stephen indicated that he suffered some arthralgias—which means painful joints—of the knees. Dr. Morrow opined that Dr. Ricca deviated from the standard of accepted medical care on January 25, 1994, when he failed to examine the "extremities of a child who is complaining of pain in the knees, who is an athlete, who is ill. And Dr. Ricca should have done that at that time." Dr. Morrow explained,

> when a young adult describes arthralgias of the knees they are describing pain below the waist. And the physical examination involves evaluation of those areas particularly where they say the pain is, in this case the knee. But usually in all the joints and structures connected with the knee.

Dr. Morrow further explained that such an examination is necessary because "it is very difficult for anyone, and in particular a child, to tell you precisely where discomfort is coming from. And they will give you usually a direction rather than a particular spot." Dr. Morrow continued:

> [W]hen you mention knee arthralgias you're really talking about pain that is discerned as coming from that extremity. So, a proper examination involves looking at the patient.
>
> . . . .
>
> You'll look at the relation of the joints to each other. You'll look at their back to see if there's any scoliosis. You'll examine the area of particular pain that you ask that patient to point to.
>
> And you see whether there's any swelling, redness, heat or other abnormalities of that area. You'll check the joint to make sure the joint [sic] of the hip, the knee, the ankle are stable.

. . . .

And that usually is a fairly, although it sounds like a long examination, is a fairly brief examination that takes about five minutes at the most, depending on the thoroughness.

When asked if such an examination would be relevant in a situation in which it appeared that many of the patient's problems were gastrointestinal, Dr. Morrow replied that in the context of a sick child who has lost

a tremendous amount of weight it is vitally important to pursue any lead that would explain the illness and the loss of weight. And in this particular case when the patient appears to be 'seriously ill' to quote Dr. Ricca, it becomes vitally important to pursue the symptoms because they might provide an important clue as to the cause of a seriously ill child.

Dr. Morrow also testified that the white blood count could be associated with, among other things, cancer of the bloodline. He found elevated neutriphils levels and testified that that can result from stress or inflammation. He also testified that the uric acid level was "markedly elevated" and that that is "also found in tissue breakdown from tumors either of the bloodline like lymphoma or a leukemia or from solid tumors."

Dr. Morrow determined that Dr. Ricca should have followed up with Stephen after receiving Dr. Kern's report in March 1994:

Q. What should the primary care physician Dr. Ricca have done at that point in getting that letter?

A. The primary care physician is obligated to reevaluate the patient to find out why he is sick.

Q. Why is that doctor?

A. We have a profoundly ill child who presents with a weight loss of a substantial portion of his body mass but we do not have a diagnostic explanation for that. So, we must now proceed and find out why this is going on.

Dr. Morrow stated that at the May 3 visit, the standard of care required that Dr. Ricca order an x-ray or otherwise image the leg to determine the cause of the swelling, and possibly make a referral to an orthopedist if he did not have the expertise to evaluate the problem:

Q. What should have been done at this point?

A. The standard of care would be to delineate why the muscle was swollen and to determine the cause of that swelling.

. . . .

Q. What do you do specifically?

A. You image the area in whatever technique will elucidate it. The simplest technique might be only a plain x-ray which might reveal the problem. Ordinarily one needs to do some more sophisticated imaging . . . such as magnetic resonance imaging. Or they can refer it to a specialty to make that decision. But it is imperative that the area be diagnosed in terms of its cause or that close follow-up be entertained over a very short period.

. . . .

Q. And in terms of referring to a specialist, tell us what you said about that.

A. If the primary care provider does not feel it's within their expertise to evaluate this kind of problem and to come to a conclusion as to its proper diagnosis and treatment then they should refer it to a specialist. And usually in bone which would be an orthopedist or a muscle specialist which is frequently also an orthopedist. But someone who has the sophistication to be able to establish a diagnosis and make a plan of treatment.

Later during direct examination, Dr. Morrow testified concerning Stephen's July 14, 1994, admission to the hospital and the ultimate diagnosis of his condition. Dr. Morrow stated that the diagnosis of Stephen's condition was " 'Osteosarcoma, chondroblastic and osteoblastic high grade' . . . . Chondroblastic meaning it's chewing up the cartilage. And osteoblastic high grade meaning it's chewing up the bone. . . . It means a very malignant osteosarcoma which is a cancer." In addition, Dr. Morrow testified that during Stephen's stay at the hospital a CAT scan was taken of his chest and his abdomen, which revealed "multiple metastatic lesions, a cancer that had spread to the lung, in many places of the lung. And a few lymph nodes that were swollen and presumed to be also cancer spread in the abdomen."

Dr. Morrow was asked if he knew, within a reasonable degree of medical probability, when the cancer had metastasized to the lung, and he responded, "no, I do not." He indicated that there was no medical evidence that he had seen that could pinpoint when the cancer had spread to Stephen's lungs. Thereafter, the following colloquy took place:

Q. Now, we talked about the deviation in January of 1994. If the doctor had done what you say he should have done based upon good medical standards would Stephen be alive today?

A. The chances of him being alive at five years with the treatments available at that time were eighty-five percent (85%).

Q. What do you mean by eighty-five percent (85%)?

A. In large samples looked at in various countries including the United States the more current treatments for osteosarcoma have been remarkably successful in nonmetastatic disease.

Q. And by nonmetastatic you mean what?

A. Disease that's localized to its point of origin.

Q. And in this case what do you mean by that?

A. If his disease was diagnosed when it was localized to its point of origin his chances of survival by the most current studies, which looked at the cohort which would have included him, were eighty-five percent (85%).

Q. Do you have any opinion in terms of how long that mass had existed on his body?

A. I am confident from a review of the medical record and the laboratory studies that it was present in January in 1994.

On cross-examination, Dr. Morrow was asked what, in his opinion, Dr. Ricca would have found if he had examined Stephen's knees during the January 25, 1994, visit. Dr. Morrow concluded,

[s]ince Stephen was as described an asthenic child, he was tall and thin, he would have discovered an area on his leg of firmness and tenderness because of his muscles being so close to the skin. Without a big fat pad it would have been very easy to uncover at that point a mass. . . . On his lateral thigh.

Next, Dr. Morrow was questioned about the metastasis of Stephen's cancer. He conceded that at his deposition he testified that he had no opinion whether Stephen's cancer had metastasized as of May 1994 or as of January 1994. The following extended dialogue then took place:

Q. Now, you were asked some questions by Mr. Auerbach as to what you thought the percentage of possibility or probability was of Stephen having a cure if his osteosarcoma had been diagnosed in January of 1994. And I think you said eighty-five (85%) percent likelihood of a cure?

A. Of a five year survival.

Q. Yes. So let me see if we all understand that. You're not saying that if the osteosarcoma had been detected and treated in January of 1994 that Stephen would be cured for life, are you?

A. There's never a guarantee of that.

Q. Doctors talk in terms of five years. Am I correct?

A. That's the most accepted way of comparing studies.

Q. So, that the eighty-five percent (85%) means that he had an eighty-five percent (85%) chance of no recurrence of that cancer over a five year period.

A. Yes.

Q. Beyond that the percentages change, don't they?

A. The cohort that came through in the '90 to '94 time and has been analyzed, we're up to 1999, is as far as we've gone with this cohort. We won't know about 10 years for another four or five years.

Q. Okay. That opinion of yours and that estimate of percentages does not consider what would have happened if Stephen had metastasis, that is spread of the cancer, as of January 1994. Am I correct?

A. That is correct. At any point, yes.

Q. Or certainly May of 1994. You are not considering what chance of survival Stephen would have had if he had been diagnosed in May of 1994 had there been metastasis as of that time.

A. That question has not been posed to me.

Q. Well, if I pose it to you now do you have an opinion?

A. Yes.

Q. As to what the likelihood of his survival would have been in May of 1994 had there been spread of the cancer in May?

A. The numbers that I reviewed seemed to be over between 20 and 30 percent five years survival, perhaps a little higher.

Q. And would that depend upon where the cancer had spread to? That is what other part of the body?

A. There are a number of factors and that is one of them, yes.

Q. Cancer of the lung is a particularly grim situation for prognosis, isn't it?

A. Compared to?

Q. Cancer in some other part of the body?

A. Well, I would say bone marrow or brain would be worse. But it's not good.

At the conclusion of cross-examination, Dr. Morrow was asked when, in his estimation, Stephen first developed the osteosarcoma. Dr. Morrow responded,

Judging by the usual time to lung metastasis of 12 to 18 months I would postulate that when the weight loss began was probably the time when his body was responding to tumor and that was probably in the fall [of 1993]. It's also the cardinal manifestation of osteosarcoma that leads to diagnosis is pain. And so that's apparently when that pain was initiated, [in the fall of 1993].

On the defense case, as described above, Dr. Ricca testified to a starkly different version of his interactions with the Verdicchios than did Mrs. Verdicchio. He denied ever refusing or delaying

referrals; denigrating Mrs. Verdicchio's relationship with her son; attributing Stephen's condition to anorexia or drugs; insisting that, as a runner, Stephen had to endure pain; refusing to accept the cancer diagnosis; or having any preconceived notions about Stephen's complaints. He also denied that he deviated in any way from the appropriate standard of medical care in his treatment of Stephen. On cross-examination the Verdicchios' lawyer was permitted to inquire of Dr. Ricca whether the Oxford Health Plan provided him with a financial incentive to minimize the number of referrals he made. Dr. Ricca denied any knowledge of such a bonus incentive at the time he was treating Stephen.

Dr. Stan Parman, a specialist in family and emergency medicine, testified on Dr. Ricca's behalf that Dr. Ricca had not deviated from the standard of care. Specifically he testified that because certain gastrointestinal problems can result in joint pain, it was not unreasonable for Dr. Ricca not to examine Stephen's knees given that his primary complaint was intestinal problems. Dr. Parman testified that Stephen's white blood count in January 1994, while suggestive of some type of infection, was nonspecific and neither the white blood count nor the slightly elevated neutriphils would be indicative of a tumor. He also testified that the uric acid level was within normal limits. On cross-examination, Dr. Parman acknowledged that in his report he stated that "one could postulate that Stephen could have been saved if only the diagnosis had been made earlier." When further questioned, he explained that that was a generic argument that could be made for all diseases; the sooner it is found, the better the chance of survival.

Dr. Arnold Rubin, a board certified specialist in internal medicine and hematology with a subspecialty in oncology also testified on behalf of Dr. Ricca. He conceded that Dr. Ricca should have examined Stephen's knee during the January 25, 1994, visit and that not doing so was a deviation. Dr. Rubin indicated that Stephen's uric acid level in January 1994 was normal and had no connection to Stephen's osteosarcoma. Dr. Rubin stated that as

between diagnosis in May or July 1994, Stephen's "care and treatment" would have been the same. However, Dr. Rubin could only state that, had the cancer been discovered in January 1994, Stephen's "ultimate outcome" would have been no different. Dr. Rubin acknowledged that in order for Stephen to have developed "an extensive disease such as that was observed in July of 1994 it would have taken probably about six months to a year."

### III

The Verdicchios' fundamental argument is that the holdings of the trial court and the Appellate Division that "it was incumbent upon plaintiff to prove through expert testimony that the osteosarcoma had not metastasized by January 25th" violate the principles established in *Evers, Scafidi* and *Gardner.*

Dr. Ricca counters that the Verdicchios failed to elicit competent medical evidence to support the conclusion that the deviation increased Stephen's risk of harm from the preexisting condition or that that increased risk was a substantial factor in bringing about the results complained of. Dr. Ricca also contends that it was the Verdicchios' burden to establish which pain and suffering damages were caused by his negligence and which resulted from the underlying disease and that they failed to do so.

Dr. Ricca's cross-petition seeks to avoid reinstatement of the verdict in the event of a reversal and urges a new trial because of what he characterizes as prejudicial and inflammatory evidence that poisoned the verdict. He also repeats his claim that the verdict cannot stand because the Verdicchios failed to prove which of their damages resulted from Dr. Ricca's negligence and which were consequences of the underlying disease.

The Verdicchios respond that the issues raised in the cross-petition procedurally are barred because, although they were fully briefed in the Appellate Division, they were not the basis of a protective cross-appeal. On the merits, they argue that the challenged evidence properly was admitted as shedding light on Dr. Ricca's attitude toward the case and on the parties' dramati-

cally different versions of their interactions. At most, the Verdicchios claim the evidence was harmless error. The Verdicchios also counter that Dr. Ricca's damages apportionment argument is meritless because it was his obligation to prove that apportionment was possible—an obligation that he failed to meet.

## IV

The issue in the case is precisely focused. Both the trial court and the Appellate Division concluded that because plaintiffs failed to "prove" that Stephen's cancer had not metastasized in January of 1994, the initial point of alleged malpractice, they could not sustain the burden in an "increased risk case" under *Evers, Scafidi* and *Gardner.* To assess that conclusion, the relevant legal principles require disquisition.

## A.

A medical malpractice case is a kind of tort action in which the traditional negligence elements are refined to reflect the professional setting of a physician-patient relationship. Thus, a plaintiff in a malpractice action must prove the applicable standard of care, *Rosenberg v. Cahill,* 99 *N.J.* 318, 492 *A.*2d 371 (1985); that a deviation has occurred, *Clark v. Wichman,* 72 *N.J.Super.* 486, 179 *A.*2d 38 (App.Div.1962); and that the deviation proximately caused the injury, *Germann v. Matriss,* 55 *N.J.* 193, 260 *A.2d* 825 (1970).

As a general rule, it is the causation element that is the most complex. There are different tests for determining proximate cause. For example, the traditional "but for" test that applies in most negligence settings "allow[s] recovery only when the injury is one that would not have occurred 'but for' the wrongful act." J.D. Lee & Barry A. Lindahl, *Modern Tort Law: Liability & Litigation* § 4.03 (West Group 2002); *Conklin v. Hannoch Weisman,* 145 *N.J.* 395, 417, 678 *A.*2d 1060 (1996); *Evers v. Dollinger,* 95 *N.J.* 399, 415, 471 *A.*2d 405 (1984); *Vuocolo*

*v. Diamond Shamrock Chemicals Co.,* 240 *N.J.Super.* 289, 295, 573 *A.*2d 196 (App.Div.), *certif. denied,* 122 *N.J.* 333, 585 *A.*2d 349 (1990). However, the "but for" test has its limitations in situations where two or more forces operate to bring about a certain result and "any one of them operating alone would be sufficient." *Modern Tort Law* § 4.03. Indeed, the "but for" test has been characterized as a potentially "insurmountable obstacle" for a plaintiff in a case in which "unrelated factors may have contributed to the same injury." Diane Schmauder, *An Analysis of New Jersey's Increased Risk Doctrine,* 25 *Rutgers L.J.* 893, 895 (1994).

In response to the apparent limitation of the "but for" test in concurrent causation cases, New Jersey, like many jurisdictions, has adopted a modified standard—the substantial factor standard—"limited to that class of cases in which a defendant's negligence combines with a preexistent condition to cause harm— as distinguished from cases in which the deviation alone is the cause of harm." *Battenfeld v. Gregory,* 247 *N.J.Super.* 538, 549, 589 *A.*2d 1059 (App.Div.1991)(citing *Scafidi, supra,* 119 *N.J.* at 108–09, 574 *A.*2d 398).[3]

The substantial factor test allows the plaintiff to submit to the jury not whether "but for" defendant's negligence the injury would not have occurred but "whether the defendant's deviation from standard medical practice increased a patient's risk of harm or diminished a patient's chance of survival and whether such increased risk was a substantial factor in producing the ultimate harm." *Gardner v. Pawliw, supra,* 150 *N.J.* at 376, 696 *A.*2d 599. Once the plaintiff demonstrates that the defendant's negligence actually increased the risk of an injury that later occurs, that conduct is deemed to be a cause "in fact" of the injury and the jury must then determine the proximate cause question: whether the increased risk was a substantial factor in bringing about the harm that occurred. Conduct is a substantial factor if it would

---

[3] *See Gardner v. Pawliw,* 150 *N.J.* 359, 375–76, 696 *A.*2d 599 (1997) (collecting cases from other jurisdictions adopting substantial factor test).

lead the trier of fact, as a reasonable person, to regard it as a cause, using that word in the popular sense. Under the "substantial factor" test, the defendant's negligence need not be the sole or primary factor producing the injury; it need only be a substantial factor. Thus the test covers the situation where there may be several substantial factors contributing to the same result.

[*Modern Tort Law* § 4.03, 4–4 (citations and internal quotations omitted).]

The *Restatement of Torts* § 431 explains that

[t]he word "substantial" is used to denote the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause, using that word in the popular sense, in which there always lurks the idea of responsibility, rather than in the so-called "philosophic sense," which includes every one of the great number of events without which any happening would not have occurred.

[*Restatement* § 431 (comment a).]

■ In other words, merely establishing that a defendant's negligent conduct had some effect in producing the harm does not automatically satisfy the burden of proving it was a substantial factor:

Some other event which is a contributing factor in producing the harm may have such a predominant effect in bringing it about as to make the effect of the actor's negligence insignificant and, therefore, to prevent it from being a substantial factor. So too, although no one of the contributing factors may have such a predominant effect, their combined effect may, as it were, so dilute the effects of the actor's negligence as to prevent it from being a substantial factor.

[*Restatement* § 433 (comment d).]

Our model jury charge reflects the same notions. *Model Jury Charges (Civil)* § 5.36E (2002).

## B.

■ A review of our case law reveals the way in which the substantial factor test has been applied in increased risk cases. In *Evers, supra,* plaintiff alleged that her physician neglected to perform appropriate diagnostic tests on a lump and bleeding sore in her breast that would have revealed breast cancer. At the time of trial, Mrs. Evers had taken no medication and had received no chemotherapy or radiotherapy, nor had she experienced a recurrence of the cancer. She claimed that the seven-month delay in diagnosis caused her "both physical and emotional injury" and

increased the risk that the cancer would recur. 95 *N.J.* at 404, 471 *A.*2d 405.

The trial court did not allow Mrs. Evers' experts' testimony into evidence because the experts "were unable to quantify the increased risk of recurrence of cancer" and thus entered a judgment for the physician. *Id.* at 405, 471 *A.*2d 405. The Appellate Division affirmed. We reversed, relying in part on the *Restatement of Torts* § 323(a) which specifically recognizes increased risk liability:

[O]ne who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) *his failure to exercise such care increases the risk of such harm.*

[*Restatement* § 323(a) (emphasis added).]

We observed in *Evers*

when there is evidence that a defendant's negligent act or omission increased the risk of harm to one in plaintiff's position and that the harm was in fact sustained, 'it becomes a question for the jury as to whether or not that increased risk was a substantial factor in producing the harm.'

[*Evers, supra,* 95 *N.J.* at 414–15, 471 *A.*2d 405 (quoting *Hamil v. Bashline,* 481 *Pa.* 256, 392 *A.*2d 1280, 1286 (1978)).]

We concluded:

When a defendant's negligent action or inaction has effectively terminated a person's chance of survival, it does not lie in the defendant's mouth to raise conjectures as to the measure of the chances that he had put beyond the possibility of realization. If there was any substantial possibility of survival and the defendant has destroyed it, he is answerable. Rarely is it possible to demonstrate to an absolute certainty what would have happened in circumstances that the wrongdoer did not allow to come to pass. The law does not in the existing circumstances require plaintiff to show to a *certainty* that the patient would have lived had she been hospitalized and operated on promptly.

[*Id.* at 417, 471 *A.*2d 405. (quoting *Hicks v. U.S.* 368 *F.*2d 626, 632 (4th Cir.1966)(emphasis in original)).]

Subsequently, in *Scafidi, supra,* we revisited our decision in *Evers* and directed that the "substantial factor" test be applied to all medical malpractice cases where the plaintiff had been suffering from a preexisting medical condition when the alleged malpractice occurred. The plaintiff in *Scafidi* claimed that de-

fendant's malpractice in treating and arresting her early labor proximately caused the premature birth and death of her child. *Id.* at 96, 695 *A.2d* 1301. The trial court declined to instruct the jury that if the defendant's negligent conduct increased the risk of the premature birth and death, damages should be awarded if the increased risk was a substantial factor in what befell the plaintiff. *Id.* at 97, 695 *A.2d* 1301. The Appellate Division held that it was error to refuse to give that charge. *Ibid.* We agreed:

> The rationale underlying the use of a two-pronged jury instruction bears elaboration. Because this modified standard of proximate causation is limited to that class of cases in which a defendant's negligence combines with a preexistent condition to cause harm—as distinguished from cases in which the deviation alone is the cause of harm—the jury is first asked to verify, as a matter of reasonable medical probability, that the deviation is within the class, i.e., that it increased the risk of harm from the preexistent condition. Assuming that the jury determines that the deviation increased the risk of harm from the preexistent condition, we use the "substantial factor" test of causation because of the inapplicability of "but for" causation to cases where the harm is produced by concurrent causes.
>
> The "substantial factor" standard requires the jury to determine whether the deviation, in the context of the preexistent condition, was sufficiently significant in relation to the eventual harm to satisfy the requirement of proximate cause.
>
> [*Id.* at 108–09, 695 *A.2d* 1301 (citations omitted).]

Thereafter, in *Gardner, supra,* where plaintiffs alleged that the failure to perform diagnostic tests that would have revealed an umbilical cord defect increased the risk that their fetus would not survive, we elucidated on the *Scafidi* standard:

> When the prevailing standard of care indicates that a diagnostic test should be performed and that it is a deviation not to perform it, but it is unknown whether performing the test would have helped to diagnose or treat a preexistent condition, the first prong of *Scafidi* does not require that the plaintiff demonstrate a reasonable medical probability that the test would have resulted in avoiding the harm. Rather, the plaintiff must demonstrate to a reasonable degree of medical probability that the failure to give the test increased the risk of harm from the preexistent condition. A plaintiff may demonstrate an increased risk of harm even if such tests are helpful in a small proportion of cases. We reach that conclusion to avoid the unacceptable result that would accrue if trial courts in such circumstances invariably denied plaintiffs the right to reach the jury, thereby permitting defendants to benefit from the negligent failure to test and the evidentiary uncertainties that the failure to test created. *See Scafidi, supra,* 119 *N.J.* at 108, 574 *A.2d* 398; *Evers, supra,* 95 *N.J.* at 417, 471 *A.2d* 405.

. . . .

Plaintiffs should have been permitted to submit for the jury's determination the questions of whether, based on the parties' expert testimony, the failure to give the NST or BPP tests had increased the risk that the fetus's condition would not be detected, treated or corrected and whether that increased risk had been a substantial factor in causing her death. *See Olah, supra,* 119 *N.J.* at 133, 574 *A.*2d 411; *Scafidi, supra,* 119 *N.J.* at 108, 574 *A.*2d 398.

[*Id.* at 387–89, 695 *A.*2d 1301.]

As one commentator observed of *Gardner:*

The Supreme Court of New Jersey reasonably resolved a legal variant of the difficult what-might-have-been problem. Cases involving concurrent causes of harm are not naturally amenable to uncomplicated judicial resolution. Given the complications, the court correctly confronted an objectionable outcome left unattended by the lower courts: Health care providers would evade liability because of the evidentiary uncertainties engendered by their own negligent omissions. Both the trial court and appellate division sought quantifiable probabilities where none were possible. The lower court perpetuated the perverse irony of requiring plaintiffs to prove the probable results of tests that the defendant put beyond the realm of realization. Unwilling to accept that result, the court placed on the jury the responsibility for making the logical and legal leap from increased risk to causation. Admittedly, such a solution licenses a degree of jury speculation about a hypothetical alternative set of circumstances. The defendant's own failure to act, however, created the conditions for that eventual jury conjecture. Further, the jury is the traditional repository for lodging such determinations on proximate causation. If Solomonic certainty on causation is not possible in cases such as *Gardner,* perhaps the outcome is best left to the judgment of a jury.

[Thomas Weisert, *Negligence–Physicians and Surgeons–Once a Plaintiff Satisfies the Reduced Burden of Proof Under the Doctrine of Increased Risk, a Jury Should Determine Whether the Doctrine of Nonperformance of Diagnostic Tests Increased the Risk of Harm and Was a Substantial Factor in Causing the Ultimate Injury—Gardner v. Pawliw,* 150 *N.J.* 359, 696 *A.*2d 599 (1997), 29 *Seton Hall L.Rev.* 395, 402–03 (1998).]

Most recently in *Reynolds v. Gonzalez,* 172 *N.J.* 266, 798 *A.*2d 67 (2002), we were faced with the case of a patient who suffered a tibial plateau fracture in a bike accident. In a lawsuit, he claimed that his paralysis and related complications resulted from his physician's negligent failure to diagnose and treat compartment syndrome (a life or limb-threatening condition involving swelling in an enclosed compartment of the body). The defendant physicians denied that plaintiff suffered from compartment syndrome, contending instead that his injuries resulted from initial nerve damage sustained in the accident. *Id.* at 275, 798 *A.*2d 67. Two

separate juries heard and both concluded that the physicians deviated from the standard of care in failing to test for compartment syndrome and that that deviation created an increased risk of harm to plaintiff. However, the juries also concluded that the increased risk was not a substantial factor in producing plaintiff's paralysis and related complications. *Ibid.*

The second trial court denied plaintiff's motion for a new trial. Plaintiff appealed arguing that the substantial factor test should be abolished or modified and that, at the very least, the burden should fall on the defendant to prove that failure to test was *not* a substantial factor in the ultimate result. The Appellate Division affirmed and we granted certification. *Id.* at 276, 798 *A.*2d 67. After recounting the history of the substantial factor test, we reaffirmed its "soundness" as a standard in concurrent-cause negligence cases, *id.* at 284–86, 798 *A.*2d 67, along with the requirement that the plaintiff bears the burden of its establishment. In so doing, we underscored the general capacity of jurors to understand and apply the standard. Nevertheless, we took note of the potential for confusion inherent in that notion:

> In *Battenfeld v. Gregory*, 247 *N.J.Super.* 538, 548, 589 *A.*2d 1059 (1991), the Appellate Division, citing *Prosser and Keeton*, stated that "[w]e are satisfied that the phrase 'substantial factor' is sufficiently intelligible to furnish adequate guidance and instruction to the jury and that it is neither possible nor desirable to reduce it to percentage terms." (Emphasis added). A more recent edition of *Prosser and Keeton* states that "if 'substantial factor' seemed sufficiently intelligible as a guide in time past, []the development of several quite distinct and conflicting meanings for the term 'substantial factor' has created risk of confusion and misunderstanding, especially when a court, or an advocate or a scholar, uses the phrase without explicit indication of which of the conflicting meanings is intended." *Prosser & Keeton, supra,* § 41, at 43 (Supp.1988). *See also Richard L. Rosenzweig, "Substantial Factor:" Plaintiff's Everest,* 146 *Pittsburgh Legal J.* 35, 35 (1998) (suggesting that the term " 'substantial' is Everest-like in its implications, and the definition, which is a far less precipitous burden, is []incomprehensible to jurors" because of "the imposing connotations of the words 'substantial factor' "); Diane Schmauder, *An Analysis of New Jersey's Increased Risk Doctrine,* 25 *Rutgers L.J.* 893, 900 (1994) (stating that most courts do not guide the jury in determining what constitutes a 'substantial' factor and that the result is that "a defendant can be held liable for a plaintiff's injury even when the jury finds that there is only a remote probability that the conduct actually contributed to the injury").

[*Id.* at 287, 798 A.2d 67.]

We referred the issue to the Model Civil Charge Committee for modification and added:

> Pending such modification, the trial court on remand should explain to the jury that a defendant's deviation need not be the only cause, nor a primary cause, for the deviation to be a substantial factor in producing the ultimate result. However, defendant's negligent conduct cannot be a remote or an inconsequential contributing factor. It must play a role that is both relevant and significant in bringing about the ultimate injury. The relative weight of an increased risk that is found to constitute a substantial factor can be reflected by the jury in the apportionment of damages between the increased risk and the pre-existing condition. The trial court also should explain to the jury that "[s]ome other event [that] is a contributing factor in producing the harm may have such a predominant effect in bringing it about as to make the effect of the actor's negligence insignificant and, therefore, to prevent it from being a substantial factor." *Restatement* § 433 cmt.d.
> [*Id.* at 288, 798 A.2d 67.]

The relevant *Model Charges (Civil)* §§ 5.36E and 7.11 have since been amended to reflect our holding in *Reynolds v. Gonzalez.* That lengthy but necessary exposition is the backdrop for our inquiry.

### IV

 Depending on the stage of the trial, three principal motions for judgment are available to the parties: a motion for judgment at the close of plaintiff's case, *R.* 4:37–2(b); a motion for judgment at the close all of the evidence, *R.* 4:40–1; and a motion for judgment notwithstanding the verdict, *R.* 4:40–2(b). All three are governed by the same evidential standard:

> [I]f, accepting as true all the evidence which supports the position of the party defending against the motion and according him the benefit of all inferences which can reasonably and legitimately be deduced therefrom, reasonable minds could differ, the motion must be denied....
> [*Estate of Roach v. TRW, Inc.,* 164 N.J. 598, 612, 754 A.2d 544 (2000) (quoting *Sons of Thunder, Inc. v. Borden, Inc.,* 148 N.J. 396, 415, 690 A.2d 575 (1997) (quoting *Dolson v. Anastasia,* 55 N.J. 2, 5–6, 258 A.2d 706 (1969))) (citations and quotations omitted in original).]

Because the trial court here granted all three motions, we treat the Verdicchios' proofs as uncontradicted and accord them the benefit of all legitimate inferences.[4] So viewed, it is clear that

---

[4] The trial court reserved on all of Dr. Ricca's motions. The dissent challenges the reservation on the *R.* 4:37–2(b) motion. Nothing in the Court Rules specifi-

both the trial court and the Appellate Division erred in concluding that those proofs did not establish that Dr. Ricca's actions increased the risk to Stephen Verdicchio.

Viewing the evidence, expert and lay, in a light most favorable to them, the Verdicchios provided a basis for the jury to conclude, to a reasonable degree of medical probability, that: Dr. Ricca deviated from the standard of care when he failed to examine Stephen's leg in January; that at that time Stephen was suffering from cancer that could have been diagnosed if an examination had occurred; that had the cancer been diagnosed its stage would have been known; that if the cancer was localized, Stephen's chance of five-year survival on immediate treatment was 85%; that if the cancer had metastasized, his chance of survival with treatment was slightly greater than 20 to 30%;[5] that the mere passage of time had given the cancer a window to metastasize to other areas of his body; that that fact rendered the cancer less

cally prohibits a trial court from reserving on a R. 4:37–2(b) motion so long as the ultimate decision on such a motion is based only upon the plaintiff's evidence. *But see Castro v. Helmsley Spear, Inc.*, 150 *N.J.Super.* 160, 375 A.2d 274 (App.Div.1977)(holding rules tacitly disapprove practice of reserving). Indeed that procedure is sometimes resorted to when the plaintiff's case is particularly lengthy or complex. Certainly it is a better practice for the court to decide the motion at the time it is made and in most cases courts, in fact, do so. To the extent that *Castro* suggests that a R. 4:37–2(b) motion that is reserved is denied, it is only partially correct. To be sure, the reservation requires defendant to put forth a case. Nevertheless, defendant is still entitled to a ruling on the adequacy of plaintiff's proofs and if, at the end of the trial, the court determines that the R. 4:37–2(b) motion, viewed solely on the backdrop of plaintiff's evidence, should have been granted, it should enter an order to that effect. It goes without saying that a reviewing court faced with a R. 4:37–2(b) issue must disregard evidence adduced on the defense case. Although much of the defense experts' testimony was supportive of the Verdicchios' claim, we have based this opinion solely on the evidence adduced on the Verdicchios' case because it amply supports our conclusions and eliminates the need for separate treatment of the R. 4:37–2(b), R. 4:40–1 and R. 4:40–2(b) motions.

[5] Although Dr. Morrow's statistical evidence of survival in cases of metastasized osteosarcoma was proffered in response to a question about the month of May, it goes without saying that Stephen's prognosis in January, if the cancer had metastized was at least that favorable.

remediable and more intractable; and that as a result of Dr. Ricca's malpractice, with its concomitant lack of treatment, Stephen's chance of survival, whether 85% or 20 to 30%, was reduced.

The Verdicchios were required only to show that Dr. Ricca's failure to perform an examination that would have led to the discovery of the cancer increased the risk that Stephen would lose the opportunity for treatment at an earlier stage. They were not required to prove the results of examinations and tests that Dr. Ricca neglected to administer. *Gardner, supra,* 150 *N.J.* at 387, 696 *A.*2d 599. Although the Verdicchios' expert was unable to render an opinion whether the cancer had metastasized by January 1994, his testimony was clear that, as a matter of medical probability, Dr. Ricca's delay increased the risk that Stephen would lose the opportunity for effective treatment of the cancer. In fact, we recognized in the failure to diagnose cancer case of *Evers* that the "passage of time" with concomitant "[d]elay in treatment almost invariably results in a more serious prognosis." *Evers, supra,* 95 *N.J.* at 409 n. 4, 471 *A.*2d 405.

The Verdicchios' case did not depend on proof that Stephen's cancer had not metastasized in January. Nor were they required to establish statistical probabilities of survival. *Id.* at 416–17, 471 *A.*2d 405; *Scafidi, supra,* 119 *N.J.* at 108–09, 574 *A.*2d 398; *Gardner, supra,* 150 *N.J.* at 389–91, 696 *A.*2d 599. The testimony of Dr. Morrow regarding the effects of the passage of time on untreated osteosarcoma would have been sufficient to meet the Verdicchios' burden. Nevertheless, as we have indicated, the Verdicchios advanced statistical proof that if the cancer had not metastasized Stephen had an 85% survival rate. Even if it had metastasized, his survival rate was, according to the evidence, 20–30% or higher. Whatever Stephen's condition was in January, the delay in diagnosis until July increased the risk that he would not be treated effectively.

Moreover, the jury was free to conclude that even if Dr. Ricca's negligence was not the only cause or even a primary cause of Stephen's suffering and death, neither was it remote nor inconse-

quential and that it was relevant and significant in bringing about the final injury. Put another way, there was a basis for the jury to conclude that the increased risk to which Dr. Ricca exposed Stephen was a substantial factor in bringing about the harm that ultimately befell him. Dr. Ricca's contentions to the contrary are simply without basis in the law or the record. In short, the Appellate Division erred in affirming the trial court's entry of judgment in favor of Dr. Ricca. Thus a reversal of that determination is required, along with a remand for reinstatement of the jury verdict.

## V

We turn next to Dr. Ricca's cross-petition which contends that if the Appellate Division judgment is reversed, a new trial on liability and damages is warranted because of specific trial errors including the admission of "prejudicial testimony" over objection, "inflammatory and inappropriate comments" made by plaintiffs' counsel during summation, and because the Verdicchios failed to prove which of their damages were attributable to Dr. Ricca and which were attributable to Stephen's preexisting disease. We will address those arguments serially.

## A.

Under our rules, all relevant evidence is admissible. *N.J.R.E.* 402. "[R]elevant evidence means evidence having a tendency in reason to prove or disprove any fact of consequence to the determination of the action." *N.J.R.E.* 401. In determining whether evidence is relevant, the inquiry focuses upon "the logical connection between the proffered evidence and a fact in issue." *State v. Hutchins*, 241 *N.J.Super.* 353, 358, 575 *A.*2d 35 (App.Div. 1990). In other words, the notion of relevance has to do with whether the evidence proffered "renders the desired inference more probable than it would be without the evidence." *State v. Davis*, 96 *N.J.* 611, 619, 477 *A.*2d 308 (1984)(quoting *State v. Deatore*, 70 *N.J.* 100, 116, 358 *A.*2d 163 (1976)). To say that

"evidence is irrelevant in the sense that it lacks probative value" means that it "does not justify any reasonable inference as to the fact in question." *State v. Allison*, 208 *N.J.Super.* 9, 17, 504 *A.*2d 1184 (App.Div.1985)(quoting *McCormick on Evidence*, § 185 at 544 (3rd ed.1984)). Conversely, if evidence does support the existence of a specific fact, even obliquely, it is relevant and admissible.

The trial court is granted broad discretion in determining the relevance of evidence. *Green v. New Jersey Mfrs. Ins. Co.*, 160 *N.J.* 480, 492, 734 *A.*2d 1147 (1999). However, even relevant evidence may be excluded if its probative value is substantially outweighed by undue prejudice. *N.J.R.E.* 403. Determinations pursuant to *N.J.R.E.* 403 should not be overturned on appeal "unless it can be shown that the trial court palpably abused its discretion, that is, that its finding was so wide off [sic] the mark that a manifest denial of justice resulted." *Green, supra,* 160 *N.J.* at 492, 734 *A.*2d 1147 (citing *State v. Carter,* 91 *N.J.* 86, 106, 449 *A.*2d 1280 (1982)). Applying those standards, there is no reason for us to intervene.

The trial court allowed Mrs. Verdicchio to testify that, in a July 18 conversation with Dr. Ricca, he continued to deny Stephen's cancer in the face of a definitive diagnosis to the contrary. In admitting that testimony the court found that it shed light on Dr. Ricca's attitude toward the case:

> That certainly goes to the issue, with all due respect, as I see it, of an alleged misdiagnosis or failure to diagnose cancer. Even in the face of a diagnosis from a hospital, he continues, according to this witness, to deny that there is cancer. It goes to buttress that cause of action.

> . . . .

> It goes to whether or not there was a failure to realize and a failure to diagnose the cancer.

We agree. If the jury believed Mrs. Verdicchio's testimony that Dr. Ricca stubbornly continued to deny that Stephen had cancer in the face of the documented diagnosis, it might well have viewed the entire trial testimony through a different lens. The jury could

have considered the purported conversation to bear on whether Dr. Ricca approached the case, as was implicit in his testimony and that of his experts, as a reasonable physician would have, or whether his preconceived theories about Stephen and his mother, or his belief in the unassailability of his own clinical judgment, affected his approach to Stephen's case. At the very least, the testimony bore on which of the starkly disparate versions of the various interactions between Dr. Ricca and the Verdicchios the jury would ultimately accept. Thus, like the trial court, we cannot say that that evidence had no logical connection to the issue in the case or that it was not one tile in the factual mosaic presented to the jury.

 Ginger Mulligan was allowed to recount Mrs. Verdicchio's hysterical response to the July 18 conversation with Dr. Ricca. In a detailed ruling, the court determined that that statement met the requirements of the excited utterance exception to the hearsay rule. *R.* 803(c)(2). We are satisfied that that determination was supported fully by the record. We likewise agree that Ms. Mulligan's recitation of Mrs. Verdicchio's emotional state, including sobbing and hysteria immediately subsequent to her conversation with Dr. Ricca, was relevant in determining whose version of that conversation was more credible, keeping· in mind that Dr. Ricca claimed the conversation was a pleasant but inconsequential one in which he agreed to forward Stephen's records, and Mrs. Verdicchio recounted a dramatic version in which Dr. Ricca denied Stephen's cancer altogether.

 Finally, the court permitted the Verdicchios' lawyer to inquire of Dr. Ricca regarding any financial incentive the Oxford Health contract might have given him to delay in making referrals. The issue of referrals was a leitmotif throughout the trial. Mrs. Verdicchio claimed that she had to "beg" for referrals and Dr. Morrow opined that Dr. Ricca's failure to make such referrals as were necessary to get to the bottom of Stephen's condition was a violation of the appropriate medical standard. In anticipation of those claims, Dr. Ricca's counsel stated in his opening: "[A]nytime

that a referral was indicated, without hesitation, Dr. Ricca gave a referral *and why wouldn't he?*" (Emphasis added). Having thrown down that gauntlet, Dr. Ricca opened the door for the trial court to allow the relatively brief inquiry into financial incentives. That is not to suggest that such evidence is generally admissible— only that the particular circumstances of this case justified its use.

B.

Dr. Ricca has also challenged three statements made by the Verdicchios' counsel during summation. The first was a brief recounting of an out-of-court conversation between counsel regarding Dr. Stillwell's absence from the case; the second was a reference to Dr. Ricca consulting with his counsel over the weekend and modifying his testimony as a result; and the third was a negative allusion to Dr. Ricca's patient records that had been redacted for confidentiality purposes. Each of those statements was improper and the trial court immediately identified each as such. The court went on to instruct the jury regarding the improper statements, declaring that they should not be considered during the deliberations on the case. We have no reason to believe that the jury disregarded those instructions. *Williams v. James*, 113 *N.J.* 619, 632, 552 *A.*2d 153 (1989); *State v. Winter*, 96 *N.J.* 640, 647, 477 *A.*2d 323 (1984)(observing that jury is presumed to follow court's directions). Nor can we conclude, on the record as a whole, that the substance of those brief statements could have affected in any way the outcome of this lengthy and hard-fought trial.

We note, in addition, that the trial court had occasion, with the benefit of time and distance, to reconsider its prior evidential determinations when Dr. Ricca moved for a new trial and for judgment notwithstanding the verdict. In so doing, the court firmly underscored that a new trial was not warranted as a result of erroneous evidential rulings or prejudice. Given that the standard of review under *N.J.R.E.* 403 precludes second-guessing

the trial court in the absence of a palpable abuse of discretion, there is simply no basis in this record for us to order a new trial.

## C.

We also disagree with Dr. Ricca's contention, adopted by the Appellate Division, that the Verdicchios' failure to prove which of Stephen's damages were attributable to his preexisting disease and which could be linked to any increased risk to which Dr. Ricca exposed him was fatal to their case. That holding misconceives the law of damage apportionment in these circumstances. As we observed in *Fosgate v. Corona*, 66 *N.J.* 268, 272–73, 330 *A.*2d 355 (1974):

> Where the malpractice involves treatment of a preexisting disease, the assessment of damages poses a problem because of the practical difficulty in separating that part of the harm caused by the malpractice from the preexisting disease and its normal consequences. Because of this, courts are now taking the view that in a situation where the malpractice or other tortious act aggravates a preexisting disease or condition, the innocent plaintiff should not be required to establish what expenses, pain, suffering, disability or impairment are attributable solely to the malpractice or tortious act, but that the burden of proof should be shifted to the culpable defendant who should be held responsible for all damages unless he can demonstrate that the damages for which he is responsible are capable of some reasonable apportionment and what those damages are. As stated in *Prosser, Law of Torts,* "The justification for this rests upon the fact that a choice must be made, as to where the loss due to failure of proof shall fall, between an entirely innocent plaintiff and defendants who are clearly proven to have been at fault to have done him harm." [Citations omitted.]

As the trial court properly instructed the jury, once the Verdicchios established by a reasonable degree of medical probability that Dr. Ricca's deviation increased the risk to Stephen and that that increased risk was a substantial factor in bringing about the harm that ultimately ensued, it fell to Dr. Ricca to establish that the damages could be reasonably apportioned and what those apportioned damages were. *Reynolds, supra,* 172 *N.J.* at 283, 798 *A.*2d 67 (citing *Scafidi, supra,* 119 *N.J.* at 111, 574 *A.*2d 398). Except for Dr. Rubin's conclusory statements that Stephen's "ultimate outcome" would have been no different had his cancer been diagnosed in January, and his "care and treatment" would have been the same had he been diagnosed in May, the defense

made no effort to show that what befell Stephen reasonably could be apportioned or to offer an apportionment scheme. That wholly conclusory testimony was inadequate to satisfy Dr. Ricca's burden under *Fosgate.* Indeed, a contrary conclusion would effectively shift to the plaintiff the burden of separating out the harm flowing from the malpractice from the consequences of the preexisting disease in every case. That in turn would eviscerate the remedial aims of *Fosgate.*

Put another way, Dr. Ricca's failure to present proof to apportion damages entitled the jury to hold him 100% liable for Stephen's losses. As it was, the jury effectively apportioned the damages between the preexisting condition and the increased risk in the allocation of only 55% of the responsibility for the outcome to Dr. Ricca, and 45% to Stephen's preexisting cancer. *See Reynolds, supra,* 172 *N.J.* at 288, 798 *A.*2d 67. Dr. Ricca's suggestion that the Verdicchios bore the burden of proof on that issue, and that they failed to sustain it, is wide of the mark.

## VI

Recapping, the Verdicchios presented evidence to satisfy the increased risk and substantial factor standards of *Evers* and its progeny. They were not required to prove the state of Stephen's cancer at the time of Dr. Ricca's deviation in order to establish their case. Nor were they required to provide statistical probabilities of survival, although they did so. Indeed, it was Dr. Ricca's failure to properly examine or refer Stephen for tests that caused the evidential uncertainty that cannot now enure to his benefit. Neither were the Verdicchios required to prove which of their specific damages were allocable to Dr. Ricca. That was his burden. Accordingly there is no warrant for our intervention.

We note that the trial court stated, in passing, that had the verdict not been set aside on purely legal grounds, a new damages trial would be in order because the amount of the award "shocked [his] conscience." Because that was not the holding in the case, the court did not set forth the reasons underlying such a conclu-

sion. Because of the way the matter arose, we do not consider the size of the verdict, standing alone, to be pending before us. We assume the court will address that issue further on the remand. We add only this, should the court determine that the damages award was excessive, remittitur should be considered as a remedy to avoid the unnecessary expense and delay of a new damages trial. *R.* 4:49–1; *Caldwell v. Haynes,* 136 *N.J.* 422, 443, 643 *A.*2d 564 (1994) (stating practice of remittitur is encouraged at trial and appellate levels in cases of excessive damages); *Baxter, supra,* 74 *N.J.* at 595, 379 *A.*2d 225 (affirming use of remittitur and recognizing its value given "unprecedented litigation caseloads"); *Fritsche v. Westinghouse Electric Corp.,* 55 *N.J.* 322, 330–31, 261 *A.*2d 657 (1970)(encouraging use of remittitur when faced with excessive verdicts to avoid unnecessary expense and delay).

## VII

The judgment of the Appellate Division is reversed. The matter is remanded for reinstatement of the verdict.

Justice LaVECCHIA, dissenting.

In *Evers v. Dollinger,* 95 *N.J.* 399, 471 *A.*2d 405 (1984), we adopted the substantial-factor test for proximate causation in medical malpractice cases involving a plaintiff's preexistent medical condition. We further clarified in *Scafidi v. Seiler,* 119 *N.J.* 93, 574 *A.*2d 398 (1990), that the test requires a two-pronged analysis in order for a plaintiff to recover for the increased risk caused by a defendant's negligence. First, a plaintiff must prove "as a matter of reasonable medical probability, that the deviation is within the class, *i.e.,* that it increased the risk of harm from the preexistent condition." *Id.* at 109, 574 *A.*2d 398. Assuming a plaintiff demonstrates that a defendant caused the increased risk, the plaintiff next must prove that "the deviation, in the context of the preexistent condition, was sufficiently significant in relation to the eventual harm to satisfy the requirement of proximate cause." *Ibid.* Once a plaintiff satisfies both prongs, then the jury may apportion the damages caused by the increased risk, in effect distinguishing between the damages from the preexistent condi-

tion and those caused by the defendant's negligence. *Id.* at 110, 574 A.2d 398. *See also Reynolds v. Gonzalez,* 172 *N.J.* 266, 286, 798 A.2d 67 (2002) (reinforcing soundness of two-part substantial factor test that includes "need for proof of causal connection between defendant's negligence and the resultant harm"). In that apportionment of damages, "a plaintiff's recovery [should] be limited to the *value of the lost chance of avoiding the harm."* *Scafidi, supra,* 119 *N.J.* at 111, 574 A.2d 398 (emphasis added).

The majority's recitation of the proofs in this case draws the reader to the seemingly ineluctable conclusion that plaintiffs met their proof requirements under that two-pronged test for causation. Therein lies my disagreement. Like the two courts that considered this matter below, I cannot help but conclude that plaintiffs failed to establish the causation requirements for this claim at the time when, pursuant to the strict application of our court rules, plaintiffs' proofs must be judged.

The plaintiffs provided the testimony of Dr. Morrow (their only expert) that the treatment provided by Dr. Ricca (defendant) deviated from the requisite standard of care in failing to diagnose Stephen Verdicchio's bone cancer. Dr. Morrow testified that in January 1994 Dr. Ricca should have examined further Stephen's extremities in an attempt to discover any abnormalities because "it is difficult for anyone, and in particular a child, to tell you precisely where the discomfort is coming from. And they will give you usually a direction rather than a particular spot." Dr. Morrow, a family practitioner, not an oncologist, further testified that he did not know within a reasonable degree of medical probability when Stephen's cancer had metastasized. He stated with confidence though, from his review of the medical records and laboratory studies, that the mass in Stephen's thigh was present in January 1994. Later in cross-examination he estimated that Stephen probably first developed the cancer, osteosarcoma, in the Fall of 1993 because "the usual time to lung metastasis [is] 12 to 18 months" and because pain, which is the "cardinal manifestation of osteosrcoma" was initiated at about that time. Dr. Morrow

expressed the view that if the cancer had *not metastasized* by January 1994 then Stephen had an eighty-five percent chance of survival over a five-year period. When questioned further, Dr. Morrow testified that if Stephen's *metastasized* cancer had been diagnosed in May 1994, then he would have had at that point a twenty to thirty percent chance of survival over a five-year period.

At the conclusion of plaintiffs' case, defendant moved for an involuntary dismissal of the wrongful death and survivorship claims. Defendant noted that the cause of death, within a year of diagnosis, was metastatic lung cancer that had been diagnosed in mid-July, 1994, and was extensive at that time. The earliest alleged negligence by defendant occurred at the end of January, 1994. Defendant asserted that, in their case in chief, plaintiffs did not produce expert testimony to establish that Stephen did not have metastatic lung cancer in January or February, 1994. There was no opinion offered on his chance of survival if there was evidence of cancer in his lungs at that time. Nor was there any expert testimony that the hospitalizations, operative procedures, and pain and suffering would not have occurred if a diagnosis had been made at that earlier time.

The trial court was concerned about the seriousness of the deficiencies in plaintiffs' case and stated to counsel during oral argument:

> Let me just say this to you. Unfortunately, I try a number of these cancer cases, failure to diagnose cancer cases. And I can't remember, and I'm not being critical at all, I can't remember one of them where an oncologist was not offered to opine to the jury the staging of the cancer, the survival rates, had the cancer been discovered earlier, et cetera. That was not done here.

Importantly, however, the court did not rule on defendant's motion at that time notwithstanding that defendant argued, correctly, that he was entitled to have the court rule on the basis of plaintiffs' proofs exclusively:

> This is the end of the plaintiff's case. I don't have to put on any case. He has to prove his case, the damages and liability at this point. And to say that we're going to try to fill in during the defense case, doesn't go to the motion I'm making now.

The court reserved, stating that the arguments would be revisited before the court charged the jury. That reservation of judgment was inappropriate. *Rule* 4:37–2(b) does not authorize a reservation of judgment. *Cf. R.* 4:40–2(a) (expressly providing option of reserving judgment on motion for judgment at close of evidence). Pursuant to *Rule* 4:37–2(b), the court either should have granted or denied defendant's motion for judgment at the close of plaintiffs' case; it should not have avoided the decision owed defendant with a promise of "revisiting" the unanswered motion prior to charging the jury. *Castro v. Helmsley Spear, Inc.,* 150 *N.J.Super.* 160, 164, 375 *A.2d* 274 (App.Div.1977).[1]

In my view, had the proofs been evaluated timely and properly, that is, limited exclusively to that which plaintiffs had submitted, the case should have been dismissed then. Plaintiffs had not submitted any expert testimony to establish Stephen's survival rate if Stephen had metastatic cancer in January 1994. Plaintiffs had compared only survival rates of non-metastatic cancer as of January 1994 with metastatic cancer present in May 1994. Even were the court to assume that testimony could be relied upon (as a duly supported opinion coming from an appropriate expert), the court nonetheless must assess whether Dr. Morrow's testimony established the requisite link between the alleged negligent act by Dr. Ricca and the alleged injury. See *Reynolds, supra,* 172 *N.J.* at 286, 798 *A.2d* 67 (rejecting contention that jury should be allowed to apportion damages only upon showing of increased risk of harm, without proof by plaintiff of "causal connection between defendant's negligence and the resultant harm"). As noted, the

---

[1] Notwithstanding the majority's clarification of *Castro* for the future, the trial court's reservation on the *Rule* 4:37–2(b) motion denied defendant the ruling to which he was entitled at the close of plaintiffs' case. As a consequence, defendant had to submit to a later review of his motion clouded by proofs defendant was required to advance during presentation of the defense case. That circumstance forced defendant to make strategy decisions unique to defending increased-risk cases while uninformed about plaintiffs' prima facia satisfaction of their causation requirements. See *infra* at 43–44, 843 A.2d at 1068–69.

trial court ultimately found that such a connection was not proven, and the Appellate Division agreed. The majority now concludes that because the jury was presented with evidence that Stephen had either an eighty-five percent chance of survival of non-metastatic cancer, or a twenty to thirty percent chance of survival of metastasized cancer, the lower threshold for proximate causation in an increased-risk case was satisfied. To me, Dr. Morrow's testimony failed to establish an increased-risk of harm that satisfied the "causal connection" requirement discussed in *Reynolds, supra,* 172 *N.J.* at 286, 798 *A.*2d 67.

In addition, I am concerned about the fairness of the process employed in this matter. Defendant was required to refute a case on increased-risk proximate causation before the trial court had ruled on the merits of defendant's *Rule* 437–2(b) motion. Placing defendant in that procedural posture posed significant consequences for defendant's presentation in respect of the issue of damages. A defendant in an increased-risk case already is burdened with the responsibility of showing that damages can, in fact, be apportioned between the harm caused by the preexisting condition and that caused by the defendant's negligence, and what the apportionment should be. *Id.* at 283, 798 *A.*2d 67 (citing *Scafidi, supra,* 119 *N.J.* at 112, 574 *A.*2d 398). That formidable task imposed on a *Scafidi* defendant should not be required before a defendant has received the benefit of a decision on a motion for judgment at the close of a plaintiff's case when such motion has been made pursuant to *Rule* 4:37–2(b). In permitting a relaxed proof requirement on the issue of damages to a *Scafidi* plaintiff, this Court did not, I presume, intend that a plaintiff be able to skip the step that requires establishment of a prima facia case on causation. Because of the unique difficulties inherent in defending against an increased-risk case, I am uncertain whether the majori-

ty's clarification of *Castro, supra*, will provide sufficient protection against unfairness to *Scafidi* defendants who have moved pursuant to *Rule* 4:37–2(b). I believe that the topic would benefit from a more thorough analysis by our Civil Practice Committee that could include the broader question whether the issue of damages in *Scafidi* cases fairly should be presented to the jury at the time that causation is being determined.

That said, in this matter, Dr. Ricca's ability to defend against this increased-risk case was affected by the uncertainty resulting from the court's seeming reservation on the *Rule* 4:37–2(b) motion. That uncertainty plainly caused trial strategy consequences. As the record demonstrates, Dr. Ricca did not present any direct evidence on apportionment of damages. Apparently, Dr. Ricca chose not to make a presentation to the jury on allocation of damages that would be inconsistent with his claim of no proximate causation. In my judgment, the trial court's failure to rule on defendant's involuntary dismissal application substantially affected the fairness of this trial, particularly in respect of defendant's ability to address the issue of allocation of damages.[2] Finally, and in addition, I note that defendant also claimed that numerous other errors plague this record, none of which were addressed by the Appellate Division in light of its assessment of the merits of plaintiffs' case. To the extent the Court is unmoved by the significance of those trial rulings, I would suggest that it misperceives their individual and cumulative prejudicial effect.

I respectfully dissent.

Justice VERNIERO joins in this opinion.

*For reversal and remandment*—Chief Justice PORITZ and Justices LONG, ZAZZALI, and ALBIN—4.

For affirmance—Justices VERNIERO and LaVECCHIA—2.

[2] I would note, moreover, that it is difficult to discern any rationale for the jury's allocation of fifty-five percent liability to Dr. Ricca and forty-five percent to Stephen's preexistent condition.