**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5576-16T1

DANIEL CHIRINO,

     Plaintiff-Appellant,

v.

CITY OF HOBOKEN and
DAWN ZIMMER, Mayor of
Hoboken in her individual
capacity,

     Defendants-Respondents.

_____

Submitted March 12, 2019 – Decided August 16, 2019

Before Judges Yannotti and Rothstadt.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Docket No. L-3671-14.

Louis Alexander Zayas, attorney for appellant.

Hanrahan Pack, LLC, attorneys for respondents (Thomas B. Hanrahan, of counsel and on the brief; Kathy Ann Kennedy, on the brief).

PER CURIAM

Plaintiff Daniel Chirino, a former member of defendant City of Hoboken's Police Department (HPD), appeals from evidentiary rulings made by the trial judge on May 30, 2017 and June 21, 2017, and from the judge's July 7, 2017 order granting Hoboken's Rule 4:37-2(b) motion for involuntary dismissal of plaintiff's complaint.[1] His complaint alleged his termination as a Hoboken police officer violated the New Jersey Law Against Discrimination (NJLAD), N.J.S.A. 10:5-1. It was undisputed that plaintiff's termination arose from two incidents involving disputes between plaintiff and his former girlfriend that resulted in disciplinary charges being brought against him based upon plaintiff lying to his superiors about one incident and a final restraining order (FRO) being issued against plaintiff under the Prevention of Domestic Violence Act, N.J.S.A. 2C:25-17 to -35.

On appeal, plaintiff argues that the trial judge improperly denied him the opportunity to introduce evidence from a prior discrimination litigation involving Zimmer because the trial judge "incorrect[ly] interpret[ed] the law of

---

[1] In addition, plaintiff appeals from another judge's April 7, 2017 order granting Hoboken's former mayor, defendant Dawn Zimmer's motion for summary judgment dismissing his complaint and a May 17, 2017 order denying reconsideration of that order. However, plaintiff's appellate brief does not address either order. For that reason, we deem his appeal from those orders to be waived. See N.J. Dep't of Envtl. Prot. v. Alloway Twp., 438 N.J. Super. 501, 505-06 n.2 (App. Div. 2015).

the case doctrine."   He also contends he adduced sufficient evidence of discrimination to warrant the denial of the Rule 4:37-2(b) motion because there were "triable issues of material fact that Hoboken had no lawful authority to terminate plaintiff without the approval of [its] police chief."  We disagree and affirm, substantially for the reasons expressed by the trial judge, Francis B. Schultz, in his oral and written decisions issued in support of each order.

I.

"We present the facts adduced at trial 'accepting as true all the evidence which supports [plaintiff's position] and according him the benefit of all inferences which can reasonably and legitimately be deduced therefrom,' as we must, given the procedural posture of this case."  Smith v. Millville Rescue Squad, 225 N.J. 373, 379-80 (2016) (alteration in original) (quoting Verdicchio v. Ricca, 179 N.J. 1, 30 (2004)).

Plaintiff, who identifies as Hispanic, was hired by Hoboken as a police officer in 2008 and had no disciplinary issues until October 1, 2011.  On that day, he was on duty when his former girlfriend, M.C., contacted him and stated that she intended to commit suicide.  Plaintiff abandoned his post without permission and went to M.C.'s Jersey City residence while armed and dressed in full uniform.  Upon his arrival, plaintiff noticed that M.C. was with a man, J.A.,

3

whom plaintiff had heard over the phone when M.C. called. A verbal altercation ensued, and J.A. contacted the Jersey City Police Department (JCPD) to report a domestic disturbance. Plaintiff left M.C.'s residence and returned to his post in Hoboken before any Jersey City police officers arrived.

The JCPD informed the HPD that plaintiff had been involved in a domestic disturbance incident. Two HPD sergeants questioned plaintiff about whether he had been in Jersey City, which he denied. Due to the conflicting reports, the sergeants asked plaintiff to write an interdepartmental memorandum, in which plaintiff again stated that he had not been in Jersey City. In the memo, plaintiff accused J.A. of filing a false police report and contended that the accusations against him were false. Plaintiff also stated that he had been told by "other Hoboken [p]olice officers and mutual friends" that J.A. was a "manipulative and compulsive liar," and that J.A. filed the report in retaliation and because he took issue with plaintiff's relationship with M.C.

The next day, plaintiff and M.C. made plans to see one another. When plaintiff arrived at M.C.'s home, he saw her drive away with J.A. Plaintiff became upset and texted M.C. that he had suicidal thoughts, and M.C. forwarded the text messages to the JCPD and the HPD.

In response to receiving the texts, Hoboken's Internal Affairs (IA) officers met with plaintiff, and questioned him about his relationship with M.C. and the text messages he sent. During the inquiry, plaintiff confirmed that he was continuing to experience suicidal thoughts.

Plaintiff was taken to the hospital for an evaluation and was released the following day. During his subsequent interview with a psychologist, plaintiff admitted that he did not intend to hurt himself, but said so due to the effect it would have on M.C. A few days later, plaintiff underwent a "fit for duty examination," and was deemed unfit. He was then required to be medically cleared, his weapon was removed from his home, and he was assigned "light duty" for three months, during which time he underwent counseling.

According to plaintiff, the next incident, which led to the entry of an FRO against him, arose from calls he received from M.C. on November 25, 2011 and from an incident the next day when M.C. let herself into plaintiff's apartment and assaulted him. Plaintiff stated that when M.C. entered his apartment, he called 911 and explained the situation. M.C. attempted to leave plaintiff's residence to avoid the authorities, but the police arrived and arrested M.C. As a result of this incident, a FRO was issued against both plaintiff and M.C. on December 22, 2011. An amended FRO was issued on February 17, 2012, which

5

allowed plaintiff to possess a firearm in the course of duty and on March 29, 2012, the FROs against plaintiff and M.C. were dismissed by consent.

However, the FRO issued against plaintiff triggered another IA investigation into his conduct. During that investigation, IA confirmed that plaintiff was in fact in Jersey City on October 1.

The IA investigation into the November 26 incident also led to the HPD imposing sanctions on plaintiff. As stated in a Preliminary Notice of Disciplinary Action (PNDA) issued in December, plaintiff was placed on administrative leave and suspended without pay for fifty days as of December 30, 2011, due to his inability to carry a firearm as a result of the FRO.

On February 16, 2012, at a meeting plaintiff and his attorney had with IA personnel, he received a Notice of Administrative Investigation that stated an investigation was being conducted regarding his reporting of the October 1 incident. At the meeting, plaintiff confessed that he lied about what had transpired on October 1, including his not abandoning his post and accusing J.A. of filing a false police report. Plaintiff was asked to submit a memorandum in which he admitted in writing to lying, and submitted it on February 17, 2012. On February 28, 2012, plaintiff received a new PNDA based on his admitted

6

untruthful reporting about the October 1 incident. According to the PNDA, Hoboken sought plaintiff's immediate termination.

On June 14, 2012, Hoboken's Chief of Police, Anthony Falco, wrote a letter to Hoboken's Business Administrator Quentin Wiest, the individual responsible for determining plaintiff's discipline, recommending that plaintiff not be terminated. Falco urged Wiest to consider "the totality of the circumstances," such as plaintiff's family and personal situations, before rendering a decision, and opined that plaintiff had been suffering from Chronic Stress Syndrome at the time of the infraction. He also explained that plaintiff had previously been a "fine officer and very professional" and that given the chance, "can again become the officer he once was."

In a second letter written on plaintiff's behalf on August 10, 2012, Falco noted the seriousness of plaintiff's infraction and recommended that he be disciplined, but urged Wiest not to pursue termination, which would be an "extreme measure" based on plaintiff's history with the department, the fact that he had had no previous disciplinary issues, his untruthfulness having been motivated by a high level of stress, and the fact that subsequent evaluations deemed him fit for duty.

A-5576-16T1

An administrative disciplinary hearing was held at plaintiff's request on August 17, 2012, addressing the two PNDAs issued to plaintiff. The hearing was conducted by Hoboken's then Public Safety Director, John Tooke, who had signed plaintiff's second PNDA. Tooke was a retired, thirty-four-year veteran of the JCPD, and served as its third in command.

After the hearing, Tooke issued a report on September 14, 2012 with his findings. He explained that the first PNDA concerned violations of Conduct Unbecoming a Public Employee and other Sufficient Cause, N.J.A.C. 4A:2-2.3(a), as well as violations of the Departmental Rules and Regulations, including Standards of Conduct, Neglect of Duty, and Conduct Subversive of the Good Order and the Discipline of the Department. The second PNDA related to violations of similar regulations, as well as Prohibited Activity on Duty, five counts of Knowingly and Willfully Making a False Entry into a Report or Record, and Failure to Properly Patrol a Post under the departmental rules.

Tooke found that plaintiff was guilty of conduct unbecoming a police officer with regard to both PNDAs, and as to the second, he was also guilty of the charged violations of Departmental Rules and Regulations. He explained that conduct unbecoming a law enforcement official "is a serious violation" and that plaintiff's actions were a "serious breach of acceptable standards of

A-5576-16T1

conduct" that "undermine[] the respect for law enforcement in general and tarnish[] the reputation of the [HPD] in particular." With regard to Neglect of Duty and Prohibited Activity on Duty, Tooke explained that failure to properly patrol and conduct subversive to good order are "very serious violations and go to the very core of the police service." He found that plaintiff's conduct "undermine[d] the foundations of discipline and prevent[ed] the effective and efficient delivery of police service." Tooke held that for both of these violations, a six-month suspension from duty and pay was appropriate.

Finally, Tooke addressed the charge that plaintiff knowingly and willfully made a false report, explaining that it "is the most serious administrative charge that can be made against a law enforcement official." Tooke did not find that plaintiff made such statements in a "haste" or "panic" as he had contended, and that his statements falsely accused J.A. of the criminal offense of filing a false police report, N.J.S.A. 2C:28-4. He noted that plaintiff involved other HPD officers in his accusations.

Tooke concluded that plaintiff's "false statements were numerous, specific, material to his job, intended to hide his wrongdoing, purposeful in the attempt to assign blame to another and willing to involve other [o]fficers in the act." He noted that from October 1, 2011 to February 16, 2012, plaintiff made

no attempt to amend his false statements, which caused the internal investigation to continue for over four months. Because "[h]onesty is an essential job function of every police officer in New Jersey," Tooke found that this violation was so egregious as to warrant termination. Based on Tooke's report, plaintiff was notified by Hoboken in a September 28, 2012 Final Notice of Disciplinary Action that he was terminated effective immediately, and his earlier fifty day suspension was approved.[2]

On August 21, 2014, plaintiff filed his complaint in this action contending that he had been the subject of unlawful retaliation under the NJLAD because he, as a Hispanic male, had been treated differently than similarly-situated Caucasian officers when his employment was terminated. According to the complaint, those other officers received discipline for violations that involved a fight in which one officer was injured, filing inaccurate reports, domestic violence, and driving while intoxicated, but were subjected to progressive discipline and were not terminated.

---

[2] Plaintiff appealed his termination to the Civil Service Commission. The appeal resulted in a settlement between plaintiff and Hoboken that was memorialized in a January 2014 "Settlement Agreement and Release" (Settlement Agreement) that described how Hoboken would advise other law enforcement agencies that were considering whether to hire plaintiff about the circumstances surrounding plaintiff's "resignation." Despite his efforts to secure employment, plaintiff could not find a new law enforcement position.

After defendants filed a successful motion under Rule 4:6-2 that led to the dismissal of plaintiff's complaint, he filed an amended complaint on April 24, 2015, alleging unlawful termination and alleging that Zimmer aided and abetted other government officials in terminating plaintiff's employment without progressive discipline, violating the NJLAD as well as the New Jersey Civil Rights Act (CRA), N.J.S.A. 10:6-1 to -2, for terminating plaintiff's employment due to national origin, ethnicity, or race. The amended complaint survived a second motion to dismiss because discovery was not yet completed.

In February 2017, plaintiff filed a motion for summary judgment, and defendants filed a cross-motion for the same relief seeking dismissal of all of plaintiff's claims. On April 7, 2017, the motion judge denied plaintiff's motion for summary judgment and granted defendants' motion for summary judgment as to Zimmer only.

In his accompanying twenty-one page statement of reasons, the judge explained that there were questions of material fact that could not be determined on the motion record relating to plaintiff's claims against Hoboken and its defenses. Addressing the claims against Zimmer, the judge found that there was no evidence that Zimmer had ever met plaintiff or was involved in the decision-

making process that led to his termination, or that she acted in concert with any other Hoboken officials.

Plaintiff filed a motion for reconsideration, which the motion judge denied after he rejected plaintiff's contentions that he incorrectly determined that Zimmer played no role in the termination. The judge explained that both Zimmer and Angel Alicea, Director of Public Safety, testified during depositions that Zimmer was uninvolved in the decision to terminate plaintiff, and Zimmer's testimony was not contradicted.

At trial, Hoboken moved in limine to bar any testimony about an earlier unrelated lawsuit successfully pursued by Alicea against Hoboken based upon Zimmer's discriminatory conduct. In response, the judge indicated he was not granting the motion at that time, but would consider it later if objections were raised while the witness testified. After Alicea testified and before Zimmer took the stand, Judge Schultz instructed the jury, sua sponte, to disregard testimony the jury heard about the verdict entered against Hoboken during Alicea's testimony, and that another judge already determined Zimmer had nothing to do with plaintiff's termination.

After the close evidence, on July 7, 2017, Judge Schultz granted defendants' motion for involuntary dismissal. In his accompanying written

decision, the judge explained that plaintiff lied willfully and repeatedly throughout the course of the investigation of the October 1 incident. The judge set out the four-part analysis—a "slightly adjusted" version of the McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) test—and questioned whether plaintiff had established a prima facie claim that would warrant an inference of discrimination because his disciplinary offenses were so serious that he could not have been performing his job at a level that met his employers' expectations.

Assuming that plaintiff had satisfied that burden, Judge Schultz also addressed plaintiff's contentions regarding plaintiff's evidence of Hoboken's disparate treatment of non-Hispanic officers who allegedly committed similar offenses but were not terminated. The judge described the incidents in detail and found that they were neither identical nor equally as serious as plaintiff's infractions. The judge also found that while there were incidents of officers who committed nearly identical but lesser offenses, all three of those officers were also minorities including two who were Hispanic. The judge concluded that plaintiff produced no evidence of discrimination against Hispanics, stating "[n]othing offered by . . . plaintiff . . . in terms of lenient treatment to white officers, approached plaintiff's conduct either in terms of identity or degree of

seriousness." In short, the judge concluded, "plaintiff produced no evidence of discrimination against Hispanics."

The judge also addressed plaintiff's contention that there was sufficient evidence to support his claim that he was entitled to a lesser punishment under the policy of progressive discipline. Citing to In re Carter, 191 N.J. 474, 484 (2007), Judge Schultz stated that there was no evidence that the "lack of progressive discipline was . . . connected to discrimination [and b]esides, progressive discipline is not for employees who commit serious offenses."

Judge Schultz rejected plaintiff's argument that only Falco could order his termination. Citing to specific Civil Service regulations applicable to imposing major discipline on a police officer, the judge concluded that "major discipline . . . can be determined by the appointing authority or its designated representative."

The judge found that "[t]he malicious and totally unnecessary statements that . . . plaintiff made about J.A. place[d] his conduct in a class of its own" that warranted termination. He then granted defendants' motion for involuntary dismissal due to a lack of evidence of discrimination. This appeal followed.

II.

In reviewing the grant or denial of a motion for involuntary dismissal, we apply a de novo standard of review. Smith, 225 N.J. at 397. We accept as true all evidence that supports the position of the party defending against the motion and accord that party the benefit of all inferences that can reasonably and legitimately be deduced therefrom. Ibid. (citing Verdicchio, 179 N.J. at 30). If, in doing so, reasonable minds could differ, the motion must be denied. Ibid. A motion for involuntary dismissal should only be granted "where no rational juror could conclude that the plaintiff marshaled sufficient evidence to satisfy each prima facie element of a cause of action." Ibid. (quoting Godfrey v. Princeton Theological Seminary, 196 N.J. 178, 197 (2008)).

Under the NJLAD, in order to establish a prima facie case of racial discrimination in the workplace, a plaintiff must show that (1) he belongs to a protected group; (2) he was performing his duties at a level that met his employer's legitimate expectations; (3) he was nevertheless terminated; and (4) the employer sought someone to perform the same work after he left. Zive v. Stanley Roberts, Inc., 182 N.J. 436, 450 (2005).

If a NJLAD plaintiff establishes those four elements, the burden then shifts to defendant to demonstrate a legitimate, non-discriminatory reason for

the termination. Gerety v. Atl. City Hilton Casino Resort, 184 N.J. 391, 399 (2005). If a defendant comes forward with such evidence, the burden shifts back to plaintiff to point to evidence that the employer's proffered reason is merely a pretext for discrimination—that is, "evidence . . . from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Zive, 182 N.J. at 455-56. The plaintiff must show both that the employer's reason was false and that it was "motivated by discriminatory intent." Henry v. N.J. Dep't of Human Servs., 204 N.J. 320, 331 (2010). Performance markers, like poor evaluations, are more properly debated and evaluated in these stages of the burden-shifting analysis than in prong two of the prima facie case. Zive, 182 N.J. at 455.

## III.

Applying these principles, we begin by addressing plaintiff's argument that the trial judge ignored plaintiff's uncontroverted evidence that Hoboken did not have a non-discriminatory motive to terminate his employment because Falco did not authorize disciplinary charges or approve the termination. Plaintiff relies upon N.J.S.A. 40A:12-118 and language in the HPD's internal rules and regulations that places with the chief of police responsibility for

16

discipline of the department's police officers. Specifically, he relies on HPD Rule 7.3.1, which deals with the department's authority to discipline, and states that "[e]xcept as otherwise provided in the Civil Service Law and N.J.S.A. 40A:14-14 to 151 . . . the department disciplinary authority and responsibility rests with the Police[ ]Chief" (emphasis added). We conclude his reliance on HPD Rule 7.3.1 is inapposite.

As the HPD rule expressly states, it is subject to the provisions of the Civil Service laws and regulations. N.J.A.C. 4A:2-2.1 to -2.6 establishes the authority for determining a police officer's violations of applicable regulations and rules for which he or she is being subjected to "major discipline." The regulations define major discipline to include removal and suspension for more than five working days. N.J.A.C. 4A:2-2.2(a). Before major discipline may be imposed, an officer is entitled to notice of the charges and an opportunity for a hearing before "the appointing authority" or its "designated representative." N.J.A.C. 4A:2-2.5; N.J.A.C. 4A:2-2.6; N.J.A.C. 4A:2-2.13 (addressing a law enforcement officer's entitlement to a hearing before a removal).

Here, plaintiff does not contend that Hoboken failed to follow the exact procedure detailed in the Civil Service regulations applicable to imposition of major discipline. Nor does plaintiff challenge Tooke's appointment as hearing

17

officer or Wiest's designation as the appropriate authority. See N.J.S.A. 40A:14-118; Marjarum v. Twp. of Hamilton, 336 N.J. Super. 85, 98 (App. Div. 2000) ("appropriate authority" is defined as the mayor, manager, or such other appropriate executive or administrative officer, "such as a full-time director of public safety, or the governing body or any designated committee or member thereof, or any municipal board or commission established by ordinance for such purposes"). Plaintiff's contention is that Hoboken acted in a discriminatory manner by following the HPD regulations' exception to a police chief's authority in major discipline cases. The argument is without any merit. Further, as Judge Schultz observed, there was no evidence that Falco's lack of involvement was linked to any suggestion of discrimination. Rather, the evidence established that Tooke and Wiest took Falco's recommendations into consideration before making their decision.

IV.

Next, we consider plaintiff's argument that he adduced sufficient evidence that defendants' stated reasons for his termination were a pretext as his removal was actually based upon discriminatory reasons demonstrated by his disparate treatment as compared to non-minority officers. We conclude, as Judge Schultz found, there was no evidence of disparate treatment.

18

At the outset, we are satisfied that even assuming plaintiff established a prima facie claim of discrimination, Hoboken successfully met its burden to come forward with non-discriminatory reasons for terminating plaintiff. We agree with Judge Schultz that plaintiff's undisputed actions on October 1, 2011 were objectively serious and included plaintiff falsely accusing someone of committing a crime.

We "have upheld dismissal of employees, without regard to whether the employees have had substantial past disciplinary records, for engaging in conduct that is unbecoming to the position." In re Hermann, 192 N.J. 19, 34 (2007). In doing so, we have held law enforcement officers to a higher standard of responsibility and conduct than other public employees. Moorestown v. Armstrong, 89 N.J. Super. 560, 566 (App. Div. 1965). "[A] police officer [cannot] complain that he or she is being held to an unfairly high standard of conduct. Rather, 'it is one of the obligations he undertakes upon voluntary entry into the public service.'" In re Phillips, 117 N.J. 567, 577 (1990) (quoting In re Emmons, 63 N.J. Super. 136, 142 (App. Div. 1960)).

In NJLAD cases, once the employer demonstrates a non-discriminatory reason for an adverse employment action, the plaintiff has an opportunity to show that the employer's purported reason is merely pretext. Gerety, 184 N.J.

19

at 399. To establish pretext, a plaintiff is entitled to offer evidence as to "whether unequal treatment has occurred, intentionally or as a result of a policy's impact on members of a protected group, [through] two approaches [that] have been generally accepted. . . . disparate treatment and disparate impact—and we acknowledge both as cognizable under the [NJ]LAD." Id. at 398. Disparate treatment is defined as where "[t]he employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin." Ibid. (quoting Peper v. Princeton Univ. Bd. of Trs., 77 N.J. 55, 81-82 (1978)).

"Evidence of pretext sufficient to permit the employee to reach a jury may be indirect, such as a demonstration 'that similarly situated employees were not treated equally.'" Jason v. Showboat Hotel & Casino, 329 N.J. Super. 295, 304 (App. Div. 2000) (citation omitted). "An inference of discrimination may arise if similarly situated employees [but] of a different [protected class] received more lenient treatment than that afforded plaintiff." Ewell v. NBA Props., 94 F. Supp. 3d 612, 624 (D.N.J. 2015) (citing Simpson v. Kay Jewelers, 142 F.3d 639, 645 (3rd Cir. 1998)).

Plaintiff must present comparator evidence sufficient to prove that he or she is "similarly situated" to his or her comparators, and that these employees

have been treated differently or favorably by their employer. See Williams v. Morton, 343 F.3d 212, 221 (3d Cir. 2003); Simpson, 142 F.3d at 645. "An 'inference of discrimination' does not [necessarily] arise 'anytime a single member of a non-protected group was allegedly treated more favorably than one member of the protected group, regardless of how many other members of the non-protected group were treated equally or less favorably.'" Jason, 329 N.J. Super. at 307 (quoting Simpson, 142 F.3d at 646). There must be proof that the individuals being compared were similarly situated.

To determine whether employees are similarly situated, "courts tend to consider whether the plaintiff and the comparator had similar job responsibilities, were subject to the same standards, worked for the same supervisors, and engaged in comparable misconduct." Ewell, 94 F. Supp. 3d at 624. Similarly-situated employees must "have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992). That does "not mean to suggest that [the listed] aspects of 'similarly situated' status are exhaustive or of equal significance in different employment contexts. The trial [court must] make a sensitive appraisal in each case to determine the most relevant criteria." Jason,

329 N.J. Super. at 305 (first alteration in original) (quoting Peper, 77 N.J. at 85). "Thus there is no bright-line rule for determining who is a 'similarly situated' employee." Ibid.

Applying these guiding principles, we conclude that there was insufficient evidence of pretext based upon disparate treatment substantially for the reason stated by Judge Schultz in his careful, sensitive analysis of plaintiff's proofs. Suffice it to say, as Judge Schultz found, plaintiff's evidence demonstrated that Hispanic and other minority members of the HPD received less harsh punishment than plaintiff for violations and many of the violations in those other matters involved different types of conduct. There was no evidence that a jury could rely upon to find that plaintiff proved Hoboken's reasons for his termination were a pretext based upon disparate treatment of non-minority officers.

V.

We turn to plaintiff's challenge to Judge Schultz's in limine, May 30, 2017 ruling, and his June 21, 2017 sua sponte ruling relating to testimony elicited from Alicea that also barred testimony from Zimmer about Zimmer's involvement in unrelated acts of discrimination as addressed in Alicea's earlier

lawsuit against Hoboken. According to plaintiff, those rulings prevented him from offering additional evidence of pretext.

In its in limine motion seeking to bar testimony about Alicea's prior action against that was based upon Zimmer's actions, Hoboken explained the circumstances surrounding Alicea's resignation as Public Safety Director and his subsequent lawsuit that relied upon claims of discrimination and led to a verdict against Hoboken in his favor. Hoboken contended that the verdict was not probative of any discrimination in this case. Moreover, Hoboken contended that Alicea was not in a comparable position to plaintiff, was not subject to the same disciplinary process as plaintiff, nor were the circumstances of his adverse employment action similar to plaintiffs. Also, according to Hoboken, the testimony should be barred as unduly prejudicial under Rule 403. Plaintiff disagreed and contended that because Alicea's case involved an adjudication of discrimination against "the same decision makers," the testimony should be admissible as evidence that discriminatory conduct permeated the police department. The judge ruled that he would not grant the motion but rather would consider any objections raised during Alicea's testimony.

Alicea testified at trial and referred to his successful litigation and the verdict entered against Hoboken, without objection. He stated that his

successful claim against Hoboken was based upon Zimmer's discriminatory practices.

The next day, prior to Zimmer testifying, the judge stated that his in limine decision did not allow the introduction of testimony about the verdict in Alicea's case and that testimony "should never have come in." The judge also noted that the "operative facts in [plaintiff's] matter pre-dated the verdict in" Alicea's case. According to the judge, there was no objection to either reference to the verdict in plaintiff's opening statement or during Alicea's testimony because both counsel misunderstood his in limine ruling as allowing the testimony to be admitted. The judge ruled that the jury must be instructed to disregard the testimony about the verdict. He stated that based on Alicea's references to Zimmer's conduct in his case and the summary judgment motion judge's order granting Zimmer's motion in this case, he would instruct the jury that "its already been determined by a Judge who heard evidence that [Zimmer] played no role in the decision to terminate" plaintiff. According to the judge, Zimmer's lack of responsibility in plaintiff's matter was "the law of the case."

In response to the judge's ruling, plaintiff's counsel conceded that the testimony about the verdict was improperly admitted and that there was no controlling law that would have supported its admission. Counsel contended,

however, that because Zimmer signed the Settlement Agreement relating to plaintiff's Civil Service appeal, there was evidence that she was directly involved in plaintiff's termination, unrelated to plaintiff's aiding and abetting claim that was dismissed on summary judgment. Further, counsel noted that there was deposition testimony from Zimmer indicating she was "approached by corporation counsel" about plaintiff. According to counsel, there was "direct evidence" that Zimmer "was aware of the matter . . . and . . . she actually participated in the decision to have [plaintiff] removed." Hoboken argued that the summary judgment motion judge's ruling as to Zimmer was controlling to the extent that plaintiff sought to demonstrate she was involved with the decision to terminate plaintiff. Moreover, the Settlement Agreement was not relevant as it was entered into eighteen months after plaintiff's termination and was clearly no more than a ministerial act by Zimmer.

The judge concluded that because Zimmer had nothing to do with plaintiff's termination, and Alicea was not a comparable victim of discrimination, he would instruct the jury to disregard any testimony about the verdict in Alicea's lawsuit and Zimmer's involvement. When the jury returned, he instructed its members as follows:

> In this case, another Judge after hearing evidence has already ruled that Mayor Dawn Zimmer of Hoboken

had nothing to do with the decision to terminate the plaintiff. She had nothing to do with that. Another Judge has ruled that and that is something that you must accept in this case. I'm also instructing you that the testimony you heard from Mr. Alicea about his lawsuit against Mayor Zimmer or . . . the City of Hoboken, that that testimony about what happened with that lawsuit and the verdict is to be totally disregarded by you. It plays no role in this case. Every now and then you may be told to forget something that you heard and not consider it. So, I'm instructing you that the testimony you heard from him about his lawsuit and the result of that lawsuit you must disregard. It cannot enter into your consideration at all and as of now you must disregard it.

On appeal, plaintiff contends that Judge Schultz misapplied the law of the case doctrine when he prevented plaintiff "from introducing relevant evidence that . . . Zimmer was involved in both . . . Alicea's termination as well as that of [plaintiff]." According to plaintiff, if plaintiff never brought the aiding and abetting claim that was decided on summary judgment, Alicea's testimony would have been admitted, and the fact that that claim was dismissed should not have barred the testimony. As to Zimmer's testimony, plaintiff argues the judge erroneously prevented the admission of evidence that Zimmer was involved in plaintiff's termination because by administrative directive she was personally involved in all employment decisions and Zimmer signed the settlement agreement. We disagree. We conclude Judge Schultz properly barred evidence

of Zimmer's involvement in Alicea's matter or plaintiff's termination as he correctly concluded that such evidence was not relevant to plaintiff's claim and was barred by the law of the case doctrine.

The law of the case doctrine states that "a legal decision made in a particular matter 'should be respected by all other lower or equal courts during the pendency of that case.'" Lombardi v. Masso, 207 N.J. 517, 538 (2011) (citing Lanzet v. Greenberg, 126 N.J. 168, 192 (1991)). It is a "non-binding rule intended to 'prevent re-litigation of a previously resolved issue.'" Ibid. (citing In re Estate of Stockdale, 196 N.J. 275, 311 (2008)). Although "an order denying summary judgment is not subject to the law of the case doctrine," Gonzales v. Ideal Tile Importing Co., Inc., 371 N.J. Super. 349, 356 (App. Div. 2004), here, the summary judgment motion judge granted the motion after he determined on the merits that Zimmer was not involved with plaintiff's termination.

We therefore conclude Judge Schultz did not err by sua sponte issuing a curative instruction or barring plaintiff from eliciting testimony from Zimmer about her role, if any, in the Alicea matter. Plaintiff presented no evidence that Zimmer was involved in plaintiff's termination and allowing any testimony about the Alicea lawsuit would have been not only contrary to the law of the

27

case, but also unduly prejudicial under Rule 403 and in violation of Rule 404(b) that addresses prior "bad acts," as there was no evidence that Zimmer was engaged in any conduct, similar to that proven in Alicea's lawsuit or otherwise, relating to plaintiff's termination.

## VI.

Finally, to the extent we have not specifically addressed any of plaintiff's remaining arguments, we conclude they are without sufficient merit to warrant discussion in a written opinion.  R. 2:3-11(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5576-16T1