**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3878-22

CAROLINE DONNELLY,
individually and as Administratrix
Ad Prosequendum of the Estate
of LISA SANTANGELO,

      Plaintiff-Appellant,

v.

OUR LADY OF LOURDES
MEDICAL CENTER, RAJA SALEM,
M.D., LAWRENCE GREENAWALD,
M.D., KENNETH LEESE, M.D.,
PUNITHA SHIVAPRASAD, D.O.,
and BRIAN BERBERIAN, M.D.,

      Defendants-Respondents,

and

VIRTUA HEALTH, VICTOR
M. BONDAR, M.D., JONATHAN
CHRISTOPHER SEDEYN, D.O.,
SUNNY KAR, D.O., JOHN MICHAEL
GALEZNIAK, D.O., LISA RINK, D.O.,
HEATHER DOWD, D.O., STEPHEN
GALLO, D.O., JEFFREY DON FLEMING,
D.O., DELANDY MCCONNELL, D.O.,
HEATHER ANN THEOBOLD, D.O.,

DIANA PANCIERA, D.O., JEREMY
ANDERSON, D.O., KUNAL VANI, D.O,
RAVNIT K. BHATIA, D.O., DEVIN
ELIZABETH HARKINS, D.O., JACOB
DAMMON WILSON, D.O., and CIERRA
JENE LEWIS, D.O.,

    Defendants.

_____

          Argued November 19, 2024 – Decided December 2, 2024

          Before Judges Susswein and Perez Friscia.

          On appeal from the Superior Court of New Jersey, Law
          Division, Camden County, Docket No. L-2921-20.

          Kristen Jones argued the cause for appellant (Piro,
          Zinna, Cifelli, Paris & Genitempo, LLC, attorneys;
          Daniel R. Bevere, of counsel; Kristen Jones, on the
          briefs).

          John A. Talvacchia argued the cause for respondents
          Our Lady of Lourdes Medical Center, Lawrence
          Greenawald, M.D., Kenneth Leese, M.D., and Brian
          Berberian, M.D. (Cooper Levenson, PA, attorneys;
          John A. Talvacchia and Anthony M. Imbesi, on the
          brief).

          Jacqueline E. Schneiders argued the cause for
          respondent Raja Salem, M.D. (German Gallagher &
          Murtaugh, attorneys; Jacob C. Lehman and Jacqueline
          E. Schneiders, on the brief).

          Darren L. Harrison argued the cause for respondent
          Punitha Shivaprasad, D.O. (Cipriani & Werner, PC,
          attorneys; Darren L. Harrison, Lois M. Shenk, and
          Richard C. Bryan, on the brief).

PER CURIAM

In this medical malpractice case, plaintiff Caroline Donnelly, administratrix ad prosequendum of the estate of Lisa Santangelo (decedent), appeals from the Law Division's (1) February 17, 2023 order granting summary judgment in favor of Dr. Raja Salem and March 31, 2023 order denying reconsideration; (2) May 5, 2023 order granting summary judgment in favor of Drs. Kenneth Leese and Lawrence Greenawald and June 23, 2023 order denying reconsideration; and (3) July 7, 2023 orders granting summary judgment in favor of Drs. Punitha Shivaprasad, Brian Berberian, and Our Lady of Lourdes Medical Center (OLOL) (collectively, along with Drs. Leese, Greenawald, and Berberian, OLOL defendants). After reviewing the record, parties' arguments, and applicable legal principles, we affirm in part, reverse in part, and remand for further proceedings.

I.

We view the following facts established in the summary judgment record in the light most favorable to plaintiff, the non-moving party. See Crisitello v. St. Theresa Sch., 255 N.J. 200, 218 (2023). On August 22, 2018, at fifty-four years old, decedent underwent an exploratory laparotomy with a total abdominal hysterectomy and bilateral salpingo-oophorectomy at OLOL. She was

discharged the same day.  On September 1, after experiencing worsening upper abdominal pain, decedent went to the emergency department of Virtua Hospital and was admitted.  She underwent a computed tomography (CT) scan, which revealed a possible small bowel obstruction.  The CT scan was read to show a "[w]hirling of small bowel mesentery to the right of midline, with moderate amount of intra-abdominal ascites."  Additionally, a Virtua doctor noted decedent was "stable," but there existed "potentially very serious [CT scan] findings," which would require "a general surgery evaluation and immediate transfer to OLOL."  On the same day, decedent was transferred and admitted to OLOL.  A resident who allegedly consulted with Dr. Leese treated decedent.

Decedent's September 2 OLOL admission record noted her Virtua CT scan "showed signs of [a small bowel obstruction] with suspicion for bowel perf[oration] and volvulus."[1]  Dr. Salem, the on-call attending physician overseeing decedent's care, approved:  the placement of a nasogastric tube; "[s]erial abdominal exams"; "an obstruction series . . . to evaluate the degree of the bowel obstruction;" and pain medication.  The charted plan noted that

---

[1]  "Volvulus is a twisting of the colon around itself, sometimes causing strangulation."  Volvulus, Merck Manual Professional Version, https://www.merckmanuals.com/professional/multimedia/image/volvulus (last visited Nov. 12, 2024).

A-3878-22

because the CT scan revealed a "possible closed loop obstruction" in decedent's bowel, the medical staff "w[ould] pay particular attention to [her] abdominal exam" and "take her to the operating room for exploratory laparotomy" if there were "any signs of peritonitis."

On September 3, decedent still had abdominal pain, and her lactate increased. An X-ray uncovered decedent had "more distended small bowel loops and partial infiltration of contrast into [the] colon." Dr. Salem approved: the assessment plan of continuing serial abdominal exams; contacting an obstetrics and gynecology doctor to see if there were "any plans for [surgery]"; providing pain medication as needed; removal of the nasogastric tube; and starting clear liquids. Decedent felt relief from the pain medication. Dr. Salem thereafter did not provide further medical care to the decedent.

On September 4, decedent experienced extreme abdominal pain and could not tolerate a diet. She had three episodes of "non-bloody, bilious green vomiting overnight." Dr. Jeffrey Fleming ordered a follow-up CT scan and discussed decedent's treatment plan with Dr. Greenawald, among others. Another X-ray showed a "[m]oderate to large amount of stool throughout the colon" and a "[n]onobstructive bowel gas pattern." A different physician later

canceled the ordered follow-up CT scan, deeming it unnecessary because the "physical exam [wa]s benign."

On September 5, Dr. Greenawald became the attending doctor for decedent. Decedent indicated moderate pain and appeared "frail." Although her abdominal pain had improved, and she began a clear liquid diet, she had another "episode of vomiting" in the morning with nausea. Dr. Shivaprasad "personally s[aw] and examined [decedent]," noting she was "improving clinically." Decedent's progress notes indicated she had a "[s]mall bowel obstruction, [p]aralytic ileus."[2] After examining decedent, Dr. Shivaprasad agreed with a physician assistant that she "need[ed] an outpatient colonoscopy in [six to eight] weeks."

On September 6, decedent had another episode of vomiting, "mild to mod[erate]" abdominal pain, "audible wheezing," and again appeared frail. She was fever-free overnight and "tolerate[d] [a] clear liquid diet." Dr. Leese attended to decedent, noting she was not in "acute distress," "did have [bowel movements]," and would possibly be "discharge[d] soon." Separately, Dr.

---

[2] "Ileus is a temporary lack of the normal muscle contractions of the intestines" that "prevents the passage of food, fluid, digestive secretions, and gas through the intestines." Parswa Ansari, Ileus, Merck Manual Consumer Version, https://www.merckmanuals.com/home/digestive-disorders/gastrointestinal-emergencies/ileus (last modified July 2024).

Berberian examined decedent and agreed with the "documented findings and plan of care." On September 7, Dr. Greenawald examined decedent. He noted decedent's "[a]bdominal cramping [wa]s still present but better," she was "[t]olerating full liquids," and her diet would be "advance[d]."

On September 8, decedent appeared to be improving, had "[n]o issues [overnight]," and had "[t]olerat[ed] [a] soft diet." Dr. Greenawald noted decedent was "tachycardic but in no acute distress" and had "[m]ild abdominal distension . . . without peritoneal signs." Soon after, however, decedent vomited a "large volume," requiring cardiopulmonary resuscitation and treatment in the intensive care unit. After the cardiac arrest, she suffered from "respiratory distress syndrome," and a later CT scan revealed "an un-survivable injury." Decedent passed away on September 14.

On August 31, 2020, plaintiff filed a two-count medical negligence complaint, asserting defendants deviated from accepted standards of medical care violating: the Survival Act, N.J.S.A. 2A:15-3, and the Wrongful Death Act, N.J.S.A. 2A:31-1 to -6. In November, Drs. Salem and Shivaprasad separately answered and cross-claimed against co-defendants. On June 17, 2021, OLOL defendants answered and cross-claimed against co-defendants.

Plaintiff requested a sixty-day discovery end date (DED) extension, which was granted, extending discovery to February 22, 2022. On February 18, 2022, the trial judge granted plaintiff's motion to extend discovery to September 10 and set a November 28 trial date. The judge ordered discovery deadlines for: fact witness depositions by May 15; plaintiff's expert reports by June 15; and defendants' expert reports by August 15. Plaintiff moved to extend discovery a third time, which OLOL defendants and Dr. Shivaprasad joined. On May 13, the judge denied plaintiff's unopposed motion, applying the exceptional circumstances standard and reasoning there had been "710 days of discovery," a trial date was fixed, and only good cause was shown.

In June, plaintiff served the expert reports of Drs. Daniel Stephens, Marc Catalano, and R. Lawrence Reed, II. Dr. Reed, a Trauma Medical Director at Florida State Medical Center, opined Drs. Greenawald, Leese, and Salem breached "the standard of care for treatment . . . in their medical care of [decedent.]" In his report, Dr. Reed recited decedent's OLOL medical history and opined on its relevance to the alleged deviations from the standard of care. In support of his opinions, Dr. Reed cited literature regarding "[t]he safety and duration of non-operative treatment for adhesive small bowel obstruction." He opined that the "[i]maging studies obtained at Virtua strongly suggested that

[decedent] had a mesenteric volvulus, which is considered a surgical emergency," but "no surgical exploration of her abdomen was ever performed," despite the "very alarming" CT scan. Dr. Reed stated the diagnostic evidence indicated "a likely closed loop obstruction," but "the surgical team at [OLOL] did not appear to be concerned about the potential for serious complications." He expanded that "instead of proceeding with the needed operation, [OLOL surgeons] determined that [decedent] warranted observation and further evaluation." In addition to the doctors' alleged deviations of not performing an exploratory laparotomy, Dr. Reed opined that "starting a clear liquid diet . . . [was] not a logical approach" as "[i]t [wa]s generally accepted that a patient with either a bowel obstruction or a paralytic ileus should not be fed anything." He asserted that providing "food or liquids into the intestinal tract [wa]s likely to further distend the already distended bowel thereby increasing the potential for vomiting (with a risk of aspiration) and/or bowel perforation." In reference to the overall treatment plan, Dr. Reed opined:

> Importantly, nothing was ever done to determine whether [decedent] actually had a paralytic ileus or if she had a small bowel obstruction. That differentiation [wa]s critical . . . with this kind of presentation. A paralytic ileus will invariably resolve although it can take several days or even weeks. Even small bowel obstructions will resolve within [forty-eight to seventy-two] hours, but longer durations should be

9

concerning and should mandate a laparotomy after that time.

Dr. Reed concluded decedent's "need for an emergency operation was ignored," and therefore, Drs. Greenawald's, Leese's, and Salem's "negligent care" caused her avoidable death.

Dr. Stephens, Chief of General Surgery at James J. Peters VA Medical Center, opined that "[t]he failure to take the patient to the operating room [wa]s a deviation from the standard of care by the surgeons Drs. Greenawald, Salem and Leese." Dr. Stephens opined, from September 4, 2018 forward, the standard of care was "to take the patient to the operating room for exploration given the initial findings on CT [scan] of a whirling sign within the mesentery, the possible presence of a mesenteric volvulus, the failure of non-surgical management, and the increased [white blood cell] count." He further provided decedent's presentment indicated "[a] closed loop small bowel obstruction" that "would not likely resolve on its own without surgical intervention." He noted the September 1 surgical consult recommendation of "nasogastric tube decompression and serial abdominal exams" was "an appropriate initial management for the diagnosis of a post[-]operative small bowel obstruction." He further opined that the failure to obtain the follow-up CT scan recommended on September 4 was "another deviation from the standard of care" because "a

10

suspected diagnosis of a closed loop obstruction and clinical deterioration" required further investigation "with surgical exploration or at minimum repeated imaging followed by surgical exploration." Dr. Stephens noted that on September 5, decedent "was still reported as . . . vomiting" and continued vomiting the next day. In summary, regarding Drs. Greenawald's, Salem's, and Leese's deviations from the standard of care and causation, Dr. Stephens stated:

> In my professional opinion, the patient had a post-operative ileus and intermittent closed loop obstruction which was not going to resolve without surgical intervention. The patient should have been taken to the operating room on [September 4, 2018] if not earlier based on the CT scan findings from [September 1] and the clinical deterioration from [September 1 to September 4.] The failure to take the patient to the operating room for the suspected diagnosis of intermittent closed loop small bowel obstruction led to the aspiration on [September 8] which led to cardiac arrest, multisystem organ failure[,] and the ultimate death of the patient.

In his deposition, Dr. Stephens opined that "every surgeon who was involved in the whole care of . . . [decedent], during the whole time, possibly ha[d] some criticism, based on the whole clinical picture and the imaging that [he] reviewed."

A-3878-22

Dr. Catalano, Medical Director at UT Bayshore Multispecialty, gastroenterologist and advanced endoscopist, opined in his report the following regarding Drs. Shivaprasad and Berberian:

> After review of the medical records, it is clear with [a] high degree of medical certainty that there was a deviation of standard of care of [decedent]. Several physicians misinterpreted, mismanaged, [and] misdiagnosed her clinical presentation that directly resulted in her death.

Dr. Catalano stated that given decedent's presentation at Virtua, laboratory studies, and the September 1 CT scan, "it [wa]s clear that a bowel obstruction [of decedent's] type would involve secondary complications." Dr. Catalano specifically asserted that Dr. Shivaprasad deviated from the standard of care, noting that the "[g]astroenterology consultation did not take place until [September 5, 2018]," and was "co-signed by Dr. Shivaprasad" along with a physician assistant. Dr. Catalano opined:

> They clearly did not review the critical CT findings of her [emergency department] presentation on [September 1]. They ignored the [a]dmitting [p]hysicians' concerns for [s]mall bowel obstruction and possible perforation. They failed to make the appropriate diagnosis [and/or] recommend appropriate follow-up cross sectional imaging. Furthermore, the GI service followed patient for only [one] day and then apparently signed off recommending a colonoscopy as an outpatient. This was clearly a deviation of standard of care.

12

In reference to the gastroenterology consult note that Dr. Shivaprasad co-signed, Dr. Catalano stated, "It [wa]s noteworthy that the [gastroenterology] consult team did not mention or address the worrisome CT findings suggesting an[] intraabdominal catastrophe. They made no recommendation for additional imaging nor having discussed [the] case with surgery." At his deposition, Dr. Catalano further opined that Dr. Shivaprasad's care of decedent on September 5 deviated from the standard of care because she did not address the "severity of the white [blood cell] count the day before, the elevated lactic acid," or recommend "additional imaging" even though decedent "had three straight days of nausea and vomiting."

As to Dr. Berberian, Dr. Catalano's report provided that his "inaction and disregard to follow a critically ill patient [was a] gross deviation of [the] standard of care" because "Dr. Berberian elected to inexplicably sign off the case" instead of conducting "follow-up imaging." He noted that "[t]he [a]ssessment and plan discussed partial bowel obstruction and ileus but nothing was done to follow-up on these potential[ly] serious diagnoses. This would have required follow-up imaging, particularly [a] CT scan as well as serial abdominal exams." In his deposition, Dr. Catalano opined that Dr. Berberian deviated from the standard of care on September 6 because he failed to: recommend "follow-

13

up imaging for [decedent's] bowel obstruction"; recommend "the needed [CT] scan for the labs that he noted and his colleague noted on [September 4]"; and address various "vital signs," such as "the temperature of 100.4," "the heart rate of 140," or decedent's "critical severe abdominal pain" and "recorded pain of six out of ten."

On July 28, OLOL defendants moved to extend discovery, and plaintiff similarly cross-moved for an extension from September 10 to December 10 for fact witness and expert depositions. On August 26, using plaintiff's proposed order, the judge granted the cross-motion, extending the DED to December 10, mandating completion of expert depositions by the DED, and adjourning the trial date to February 13, 2023.

On January 3, 2023, Dr. Salem moved for summary judgment, which the judge granted, dismissing with prejudice plaintiff's claims and all cross-claims against Dr. Salem. The judge denied plaintiff's reconsideration motion regarding summary judgment in favor of Dr. Salem. On March 21, Drs. Leese and Greenawald moved for summary judgment, which the judge granted, dismissing plaintiff's claims. The judge denied plaintiff's reconsideration motion regarding Drs. Leese and Greenawald. On May 25, Dr. Berberian and OLOL moved for summary judgment, and on May 30, Dr. Shivaprasad moved

for summary judgment.  On July 7, the judge granted summary judgment in favor of Dr. Shivaprasad, OLOL, and Dr. Berberian.

On appeal, plaintiff raises the following points for our consideration:

POINT I

THE TRIAL COURT ERRED IN DENYING PLAINTIFF'S MOTION TO EXTEND DISCOVERY BY APPLYING THE EXCEPTIONAL CIRCUMSTANCES STANDARD WHERE THE MOTION TO EXTEND WAS RETURNABLE FIVE MONTHS BEFORE THE [DED] AND THUS THE GOOD CAUSE STANDARD APPLIED.

POINT II

THE TRIAL COURT ERRED IN DISMISSING PLAINTIFF'S COMPLAINT AGAINST THE SURGICAL DEFENDANTS, DRS. SALEM, LEESE[,] AND GREENAWALD, WHERE PLAINTIFF ESTABLISHED A PRIMA FACIE MEDICAL MALPRACTICE CLAIM.

POINT III

THE TRIAL COURT ERRED IN DISMISSING PLAINTIFF'S CLAIMS AGAINST THE GASTROENTEROLOGISTS, DR. BERBERIAN AND DR. SHIVAPRASAD, WHERE PLAINTIFF ESTABLISHED A PRIMA FACIE MEDICAL MALPRACTICE CLAIM.

15

## II.

A trial court's decision on a discovery matter is "entitled to substantial deference and will not be overturned absent an abuse of discretion." DiFiore v. Pezic, 254 N.J. 212, 228 (2023) (quoting State v. Stein, 225 N.J. 582, 593 (2016)). "[W]e generally defer to a trial court's disposition of discovery matters unless the court has abused its discretion or its determination is based on a mistaken understanding of the applicable law." Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 371 (2011) (quoting Rivers v. LSC P'ship, 378 N.J. Super. 68, 80 (App. Div. 2005)). This deferential standard of review generally applies to discovery extensions. See ibid. But "legal determinations based on an interpretation of our court rules" are reviewed de novo. Hollywood Café Diner, Inc. v. Jaffee, 473 N.J. Super. 210, 216 (App. Div. 2022) (quoting Occhifinto v. Olivo Constr. Co., 221 N.J. 443, 453 (2015)).

Rule 4:24-1(c) provides "if good cause is otherwise shown, the court shall enter an order extending discovery." "No extension of the discovery period may be permitted after an arbitration or trial date is fixed, unless exceptional circumstances are shown." Ibid. "'Good cause' under Rule 4:24-1(c) is a flexible term and 'its meaning is not fixed and definite.'" Tynes v. St. Peter's Univ. Med. Ctr., 408 N.J. Super. 159, 169 (App. Div. 2009) (quoting Leitner v. Toms River

16

Reg'l Schs., 392 N.J. Super. 80, 87 (App. Div. 2007)). Relative to the "exceptional circumstances" standard, the "good cause" standard is more "lenient." See Bldg. Materials Corp. of Am. v. Allstate Ins. Co., 424 N.J. Super. 448, 480 (App. Div. 2012).

We first address plaintiff's contention that the judge erroneously denied her timely-filed discovery extension motion by applying the exceptional circumstances standard. Plaintiff argues the judge's scheduling of a trial date during the preliminary stages of discovery did not obviate the application of the good cause standard. We agree. Based on the plain language of Rule 4:24-1(c), the good cause standard applied. See Puglia v. Phillips, 473 N.J. Super. 402, 411 (App. Div. 2022) ("We look first to the plain language of the rules and give the words their ordinary meaning." (quoting Robertelli v. N.J. Off. of Att'y Ethics, 224 N.J. 470, 484 (2016))).

Nevertheless, the judge's August 2022 order extending discovery until December 2022 rectified the error. Notably, the judge granted plaintiff's cross-motion for a discovery extension to complete "outstanding fact witness and expert discovery." The judge extended the DED for three months, ordering the completion of expert depositions and a February 13, 2023 trial date. The order plaintiff provided did not delineate a date for completing the fact witness

depositions. See R. 4:24-1(c) (extending discovery orders shall "set forth proposed dates for completion" of discovery). The order, however, did not preclude plaintiff from completing the requested discovery before the December DED. Therefore, we are unpersuaded that the judge erred in denying plaintiff's April 2022 motion for extension of discovery.

## III.

Our review of a trial court's summary judgment decision is de novo. DeSimone v. Springpoint Senior Living, Inc., 256 N.J. 172, 180 (2024); see also R. 4:46-2(c). "The court's function is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" Rios v. Meda Pharm., Inc., 247 N.J. 1, 13 (2021) (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995)). "To decide whether a genuine issue of material fact exists, the trial court must 'draw[] all legitimate inferences from the facts in favor of the non-moving party.'" Ibid. (alteration in original) (quoting Friedman v. Martinez, 242 N.J. 449, 472 (2020)); see also R. 4:46-1 to -6. To rule on summary judgment, courts must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Vizzoni v. B.M.D., 459 N.J. Super. 554, 567 (App. Div. 2019) (quoting Liberty

Surplus Ins. Corp. v. Nowell Amoroso, P.A., 189 N.J. 436, 445-46 (2007)). "Summary judgment should be granted 'if the discovery and any affidavits show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.'" DeSimone, 256 N.J. at 180-81 (quoting Perez v. Professionally Green, LLC, 215 N.J. 388, 405 (2013)) (internal quotation marks omitted).

We review orders denying reconsideration for abuse of discretion. AC Ocean Walk, LLC v. Blue Ocean Waters, LLC, 478 N.J. Super. 515, 523 (App. Div. 2024). A court abuses its discretion "when a decision is made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis." Mims v. City of Gloucester, 479 N.J. Super. 1, 5 (App. Div. 2024) (quoting Kornbleuth v. Westover, 241 N.J. 289, 302 (2020)). "To prove medical malpractice[,] . . . 'a plaintiff must present expert testimony establishing (1) the applicable standard of care; (2) a deviation from that standard of care; and (3) that the deviation proximately caused the injury.'" Haviland v. Lourdes Med. Ctr. of Burlington Cnty., Inc., 250 N.J. 368, 384 (2022) (quoting Nicholas v. Mynster, 213 N.J. 463, 478 (2013)).

"As a general rule, it is the causation element that is the most complex." Verdicchio v. Ricca, 179 N.J. 1, 23 (2004). Because the traditional "but for"

19

causation standard "has its limitations in situations where two or more forces operate to bring about a certain result," New Jersey courts have adopted the "substantial factor" causation standard in such situations. Id. at 24. This standard examines "whether the defendant's deviation from standard medical practice increased a patient's risk of harm or diminished a patient's chance of survival and whether such increased risk was a substantial factor in producing the ultimate harm." Ibid. (quoting Gardner v. Pawliw, 150 N.J. 359, 376 (1997)); see also Scafidi v. Seiler, 119 N.J. 93, 108 (1990) ("Evidence demonstrating within a reasonable degree of medical probability that negligent treatment increased the risk of harm posed by a preexistent condition raises a jury question whether the increased risk was a substantial factor in producing the ultimate result.").

"The admission or exclusion of expert testimony is committed to the sound discretion of the trial court." Townsend v. Pierre, 221 N.J. 36, 52 (2015).

> It is generally recognized that in the ordinary medical malpractice case[,] "the standard of practice to which [the defendant-practitioner] failed to adhere must be established by expert testimony," . . . [because] a jury generally lacks the "requisite special knowledge, technical training and background to be able to determine the applicable standard of care without the assistance of an expert."

> [Rosenberg v. Cahill, 99 N.J. 318, 325 (1985) (second alteration in original) (quoting Sanzari v. Rosenfeld, 34 N.J. 128, 134-35 (1961)).]

"The net opinion rule is a 'corollary of [N.J.R.E. 703] . . . which forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data.'" Townsend, 221 N.J. at 53-54 (alteration in original) (quoting Polzo v. County of Essex, 196 N.J. 569, 583 (2008)). Experts are required to "give the why and wherefore that supports the opinion, rather than a mere conclusion." Id. at 54 (quoting Borough of Saddle River v. 66 E. Allendale, LLC, 216 N.J. 115, 144 (2013)) (internal quotation marks omitted). They must "be able to identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are reliable." Id. at 55 (quoting Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992)). Thus, "[t]he net opinion rule is succinctly defined as 'a prohibition against speculative testimony.'" Harte v. Hand, 433 N.J. Super. 457, 465 (App. Div. 2013) (quoting Grzanka v. Pfeifer, 301 N.J. Super. 563, 580 (App. Div. 1997)).

We also recognize that "an employer will be held vicariously liable under the doctrine of respondeat superior 'for the negligence of an employee causing injuries to third parties, if, at the time of the occurrence, the employee was acting

within the scope of his or her employment.'" Moschella v. Hackensack Meridian Jersey Shore Univ. Med. Ctr., 258 N.J. 110, 127 (2024) (quoting Carter v. Reynolds, 175 N.J. 402, 408-09 (2003)). New Jersey courts apply the companion "principle that 'a verdict which exonerates the employee from liability requires also the exoneration of the employer.'" Walker v. Choudhary, 425 N.J. Super. 135, 152 (App. Div. 2012) (quoting Kelley v. Curtiss, 16 N.J. 265, 270 (1954)).

## A. Drs. Leese, Greenawald, and Salem

### i. Drs. Leese and Greenawald

Plaintiff contends the judge erroneously granted Drs. Leese and Greenawald summary judgment because Drs. Stephens's and Reed's medical opinions established a prima facie case of negligence. Plaintiff posits the experts' opinions, which are supported by facts and accepted medical methodology, create disputed material issues regarding Drs. Leese's and Greenawald's multiple deviations from the standard of care and a causal relationship to decedent's death. Specifically, plaintiff argues Drs. Stephens's and Reed's opinions sufficiently addressed the standard of care for surgeons evaluating a patient with decedent's symptomology, which included a CT scan evidencing "mesenteric volvulus with [a] likely closed loop [bowel]

22

A-3878-22

obstruction," and that Drs. Leese and Greenawald violated those standards. We agree.

It is undisputed decedent came under Dr. Greenawald's care on September 5, 2018 and Dr. Leese's care on September 6.[3]  Dr. Stephens opined that, as of September 4, the standard of care required taking decedent "to the operating room for exploration given the initial findings on CT."  Similarly, Dr. Reed opined that based on decedent's symptoms and the Virtua imaging studies, there was a "high likelihood of having a very dangerous intestinal volvulus" that mandated an emergency surgical procedure and a laparotomy.  Drs. Stephens's and Reed's reports each provided a sufficient foundation for their opinions that surgeons Drs. Leese's and Greenawald's nonperformance of surgery on decedent deviated from the standard of care. Rosenberg v. Tavorath, 352 N.J. Super. 385, 399 (App. Div. 2002) ("To establish a prima facie case of negligence in a medical malpractice action, a plaintiff usually must present expert testimony to establish the relevant standard of care, the doctor's breach of that standard, and a causal connection between the breach and the plaintiff's injuries.").  Plaintiff

---

[3]  We note there is a dispute of fact regarding whether Dr. Leese cared for decedent on September 1, the date of her admission, and view the facts in the light most favorable to plaintiff.

is correct that "[a]n expert's proposed testimony should not be excluded merely 'because it fails to account for some particular condition or fact which the adversary considers relevant.'" Townsend, 221 N.J. at 54 (quoting Creanga v. Jardal, 185 N.J. 345, 360 (2005)). Thus, Drs. Stephens's and Reed's opinions are not precluded simply because their reports gave little consideration to facts in the medical record that Drs. Leese and Greenawald deemed potentially relevant.

Dr. Stephens opined that Drs. Leese's and Greenawald's failure to follow up on the September 4 CT scan Dr. Fleming ordered was a deviation from the standard of care. Dr. Stephens opined that decedent's "clinical deterioration need[ed] to be investigated further with surgical exploration or at minimum repeated imaging followed by surgical exploration." Additionally, Dr. Reed opined it was a deviation from the "generally accepted" standard of care to have started decedent, who had a suspected bowel obstruction or paralytic ileus, on a liquid diet because it increased the "potential for vomiting (with a risk of aspiration) and/or bowel perforation." Regarding causation, Drs. Stephens and Reed each concluded the deviations from the standard of care were a substantial factor in decedent's death.

Viewing the record in a light most favorable to plaintiff, we part ways with the judge's granting of summary judgment to Drs. Greenawald and Leese, as Drs. Stephens and Reed sufficiently provided opinions alleging deviations from the standard of care and causation.

ii. Dr. Salem

Plaintiff contends the judge also erred in granting Dr. Salem summary judgment as Drs. Stephens's and Reed's expert reports alleged deviations from the standard of care and causation. Specifically, plaintiff posits the judge "failed to appreciate Dr. Salem was the consulting general surgeon responsible" for decedent's care on September 2 and September 3, 2018. Our review of Drs. Stephens's and Reed's reports fails to fairly demonstrate a prima facie showing that Dr. Salem deviated from the standard of care and was a substantial factor in causing decedent's death.

Contrary to plaintiff's argument, Dr. Stephens opined that the September 1 plan of a "nasogastric tube decompression and serial abdominal exams" was "appropriate initial management for the diagnosis of a post[-]operative small bowel obstruction." He thereafter concluded that on September 4, because decedent, in addition to her CT scan and symptomatology, continued to vomit three times overnight, had "extreme abdominal pain," and had a white blood cell

count of 17,300, "it would have been the standard of care to take the patient to the operating room for exploration."  Dr. Stephens further opined it was a deviation from the accepted medical standard of care to not follow up on the CT scan Dr. Fleming recommended on September 4.  These alleged deviations from September 4 forward are inapplicable to Dr. Salem because his care of decedent ended on September 3.  Thus, Dr. Stephens did not sufficiently allege a deviation by Dr. Salem for failing to surgically intervene or conduct a diagnostic CT scan.

Plaintiff also argues Dr. Reed's opinion sufficiently established Dr. Salem deviated from the accepted standard of care regarding decedent's diet.  While Dr. Reed opined Dr. Salem deviated from the standard of care as to decedent's diet, noting that the nasogastric tube was removed and a plan for "clear liquid diet" started under Dr. Salem's care on September 3, no opinion regarding causation can fairly be discerned.  Absent from Dr. Reed's report is an opinion that Dr. Salem's care was a substantial cause in decedent's death.

Providing plaintiff all reasonable inferences, there is no reason to disturb the judge's grant of summary judgment in favor of Dr. Salem, because plaintiff's experts failed to establish Dr. Salem's alleged deviation from the standard of care by recommending a liquid diet on September 3 proximately caused decedent's death on September 14.

26

iii. <u>Drs. Shivaprasad, Berberian, and OLOL</u>

Plaintiff next argues the judge erroneously granted summary judgment to gastroenterologists Drs. Shivaprasad and Berberian because Dr. Catalano's opinion established a prima facie showing that their failure to order a follow-up CT scan deviated from the accepted standard of care for gastroenterologists. Further, regarding causation, plaintiff argues Dr. Catalano specifically opined that Drs. Shivaprasad and Berberian were "a contributing factor" to decedent's death because the failure to obtain a CT scan was "a critical mistake," and had the imaging "been properly obtained, more than likely [it] would have demonstrated progressive small bowel obstruction, at the very least." We agree that Dr. Catalano's opinions establish a prima facie showing that Drs. Shivaprasad and Berberian deviated from the standard of care for gastroenterologists and that the deviations were a substantial factor in decedent's death.

Relevantly, Dr. Catalano opined Dr. Shivaprasad committed a deviation by "failing to make the appropriate diagnosis and[/]or recommend appropriate follow-up cross sectional [CT scan] imaging." Further, Dr. Catalano testified that Dr. Shivaprasad's care of decedent on September 5 deviated from the accepted standard of care because she did not address the "severity of the white

27

[blood cell] count the day before, the elevated lactic acid," or recommend "additional imaging" even though decedent "had three straight days of nausea and vomiting."

Dr. Catalano also opined Dr. Berberian deviated from the standard of care because he did nothing to address the "potential serious diagnoses." He opined that "Dr. Berberian elected to inexplicably sign off the case" and failed to: recommend "follow-up imaging for [decedent's] bowel obstruction"; recommend "the needed [CT] scan for the labs that he noted[,] and his colleague noted on [September 4]"; and address various concerning "vital signs."

Regarding causation, Dr. Catalano concluded Drs. Shivaprasad and Berberian "b[o]re responsibility" because they "misinterpreted, mismanaged, [and] misdiagnosed [decedent's] clinical presentation that directly resulted in her death." Dr. Catalano's expert opinions create material issues of fact regarding whether Drs. Shivaprasad and Berberian "increased [decedent]'s risk of harm or diminished [decedent]'s chance of survival." Verdicchio, 179 N.J. at 24 (quoting Gardner, 150 N.J. at 376).

We are therefore constrained to again part ways with the judge's decision granting summary judgment, as Dr. Catalano sufficiently alleged Drs. Shivaprasad and Berberian treatment of decedent deviated from the accepted

28

standard of care for gastroenterologists, which allegedly was a substantial factor in contributing to her death.  See Nicholas, 213 N.J. at 481-82 ("When a physician is a specialist and the basis of the malpractice action 'involves' the physician's specialty, the challenging expert must practice in the same specialty." (quoting Henry v. Buck, 207 N.J. 377, 391 (2011))).

Accordingly, we affirm summary judgment granted in favor of Dr. Salem. We reverse the judge's orders granting summary judgment in favor of Drs. Leese, Greenawald, Shivaprasad, and Berberian.  We therefore also reinstate plaintiff's vicarious liability claim against OLOL.

To the extent not addressed, plaintiff's remaining contentions lack sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3878-22